1   DENNIS J. HERRERA, State Bar #139669
    City Attorney
2   WAYNE SNODGRASS, State Bar #148137
    CHRISTINE VAN AKEN, State Bar #241755
3   Deputy City Attorneys
    1 Dr. Carlton B. Goodlett Place
4   City Hall, Room 234
    San Francisco, California 94102-4682
5   Telephone:   (415) 554-4633
    Facsimile:   (415) 554-4699
6   E-Mail:     christine.van.aken@sfgov.org

7   Attorneys for Defendants
    CITY AND COUNTY OF SAN FRANCISCO,
8   SAN FRANCISCO MAYOR EDWIN LEE, and
    SAN FRANCISCO POLICE CHIEF GREG SUHR

9

10                    UNITED STATES DISTRICT COURT

11                 NORTHERN DISTRICT OF CALIFORNIA

12

| | |
|---|---|
| 13  SAN FRANCISCO VETERAN POLICE OFFICERS ASSOCIATION, LARRY BARSETTI, RAINERIO GRANADOS, ARTHUR RITCHIE, and RANDALL LOW, | Case No. CV 13-5351 WHA |
| 14 | **CITY AND COUNTY OF SAN FRANCISCO'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| 15      Plaintiffs, | |
| 16    vs. | Hearing Date:   Feb. 13, 2013 |
| 17  THE CITY AND COUNTY OF SAN FRANCISCO, THE MAYOR OF SAN | Time:         8:00 a.m.<br>Place:       Courtroom 8, 19th Floor |
| 18  FRANCISCO, EDWIN LEE in his official capacity, THE CHIEF OF THE SAN | Date Action Filed:  Nov. 19, 2013 |
| 19  FRANCISCO POLICE DEPARTMENT, GREG SUHR, in his official capacity, and | Trial Date:    None Set |
| 20  DOES 1-10, | |
| 21      Defendants. | |

22

23

24

25

26

27

28

                                   n:\govlit\li2013\140610\00897197.doc

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 1

I.    History of Large-Capacity Magazine Restrictions ................................................... 1

II.    The Use of Large-Capacity Magazines Increases the Lethality of Criminal
Attacks ................................................................................................................. 4

III.    Plaintiffs' Evidence Does Not Rebut This Showing of Increased Lethality .......... 5

IV.    Large-Capacity Magazines Are Not Useful for Self-Defense in the Home ........... 9

V.    Plaintiffs Fail to Show that Large-Capacity Magazines Are in Common Use for
Self-Defense ....................................................................................................... 11

ARGUMENT ................................................................................................................... 12

I.    Preliminary Injunction Standard ......................................................................... 13

II.    Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims. ...................... 13

A.    Intermediate Scrutiny Should Apply Because the LCM Ban Does Not
Impact Plaintiffs' Ability to Defend Themselves in the Home or
Elsewhere. ............................................................................................... 13

B.    The LCM Ban Is Constitutional Because It Advances San Francisco's
Compelling Interest in Mitigating Gun Violence. .................................... 20

C.    Plaintiffs Misread *Heller* When They Ask the Court to Strike Down
Police Code § 619 Categorically. ............................................................ 22

D.    Alternatively, Large-Capacity Magazines Are Outside the Second
Amendment's Protections Entirely. ......................................................... 24

III.    The Remaining Preliminary Injunction Factors Favor San Francisco. ................. 25

# TABLE OF AUTHORITIES

**Federal Cases**

*Alliance for the Wild Rockies v. Cottrell*
    632 F.3d 1127 (9th Cir. 2011) .......................................................13

*Drake v. Filko*
    724 F.3d 426 (3d Cir. 2013) .......................................................15

*Heller v. District of Columbia*
    D.C. Cir. No. 10-7036.......................................................19

*Heller v. District of Columbia*
    554 U.S. 570 (2008).......................................................*passim*

*Heller v. District of Columbia*
    670 F.3d 1244 (D.C. Cir. 2011).......................................................16, 17, 20

*Hightower v. City of Boston*
    693 F.3d 61 (1st Cir. 2012) .......................................................16

*Ill. Ass'n of Firearms Retailers v. City of Chicago*
    -- F. Supp. 2d --, 2014 WL 31339 (N.D. Ill. Jan. 6, 2014) .......................................................12

*Kachalsky v. County of Westchester*
    701 F.3d 81 (2d Cir. 2012) .......................................................12, 15, 18, 21

*Kampfer v. Cuomo*
    2014 WL 49961 (N.D.N.Y. Jan. 7, 2014).......................................................18

*McDonald v. City of Chicago*
    561 U.S. --, 130 S. Ct. 3020 (2010).......................................................12

*Moore v. Madigan*
    702 F.3d 933 (7th Cir. 2012) .......................................................15

*Nat'l Rifle Ass'n v. Bureau of Alcohol, Tobacco & Firearms*
    700 F.3d 185 (5th Cir. 2012) .......................................................12, 14

*NYSRPA v. Cuomo*
    – F. Supp. 2d –, 2013 WL 6909955 (Dec. 31, 2013).......................................................8, 17, 18

*Olympic Arms v. Buckles*
    301 F.3d 384 (6th Cir. 2002) .......................................................19

*Osterweil v. Bartlett*
    706 F.3d 139 (2d Cir. 2013) .......................................................20

*Robertson v. City & County of Denver*
    874 P.2d 325 (Colo. 1994).......................................................17, 18

*Tardy v. O'Malley*
  U.S. District Court, N.D. M.D., Case No. 13-cv-2861 ....................................................17

*Turner Broad. Sys., Inc. v. FCC*
  512 U.S. 622 (1994)..................................................................................................15, 21

*United States v. Carter*
  669 F.3d 411 (4th Cir. 2012) ...........................................................................................21

*United States v. Chester*
  628 F.3d 673 (4th Cir. 2010) .....................................................................................14, 17

*United States v. Chovan*
  735 F.3d 1127 (9th Cir. 2013) ................................................................................ *passim*

*United States v. DeCastro*
  682 F.3d 160 (2d Cir. 2012) .............................................................................................18

*United States v. Marzzarella*
  614 F.3d 85 (3d Cir. 2010) .............................................................................14, 16, 17

*United States v. Miller*
  307 U.S. 174 (1939)..................................................................................................23, 24

*United States v. Skoien*
  614 F.3d 638 (7th Cir. 2010) (en banc) ..........................................................................14

*Winter v. Natural Res. Defense Council*
  555 U.S. 7 (2008)......................................................................................................13, 25

*Woollard v. Gallagher*
  712 F.3d 865 (4th Cir. 2013) ...........................................................................................15

**State Cases**
*Arnold v. Cleveland*
  616 N.E.2d 163 (Ohio 1993) ............................................................................................18

*Beaver v. City of Dayton*
  1993 WL 333641 (Ohio Ct. App. Aug. 30, 1993) ...........................................................18

*Benjamin v. Bailey*
  662 A.2d 1226 (Conn. 1995) ............................................................................................18

*Cincinnati v. Langan*
  640 N.E.2d 200 (Ohio Ct. App. 1994)..............................................................................18

*Kasler v. Lockyer*
  23 Cal.4th 472 (2000) .......................................................................................................19

*Oregon State Shooting Ass'n v. Multnomah County*
  858 P.2d 1315 (Or. Ct. App. 1993)...................................................................................19

**Federal Statutes**

18 U.S.C. § 922(g) ................................................................................14

26 U.S.C. § 5801 ..................................................................................24

26 U.S.C. § 5821 ..................................................................................24

The National Firearms Act of 1934
    48 Stat. 1236 ..................................................................................24

Pub. L. 103-322, Sept. 13, 1994, 108 Stat. 1796, 1998-2000 ...............2, 8

**State Statutes & Codes**

1998 Mass. Stats. ch. 180, § 8...............................................................3

2000 N.Y. Sess. Laws ch. 189, § 11 .......................................................3

2002 Md. Sess. Laws ch. 26, § 2 ............................................................3

2013 Colo. Stats. H.B. 13-1224 ..............................................................3

2013 Conn. Acts P.A. 13-3, § 23 ............................................................3

2013 Md. Sess. Laws ch. 427, § 1 ..........................................................3

2013 N.Y. Sess. Laws ch. 1, § 38 ...........................................................3

2013 N.Y. Sess. Laws ch. 1, § 41-b ........................................................3

Cal. Penal Code §§ 26300, *et seq.* .........................................................15

Cal. Penal Code §§ 30600, *et seq.* .........................................................20

Cal. Penal Code § 32310...................................................................2, 11, 15

Cal. Penal Code § 32400........................................................................15

Cal. Penal Code § 32450........................................................................15

Cal. Stats. 1999, ch. 129, § 3 .................................................................2

Cal. Stats. 1999, ch. 129, § 3.5 ..............................................................2

Conn. Gen. Stat. § 53-202c ...................................................................20

D.C. Code § 7-2502.02 ..........................................................................20

Haw. Rev. Stat. § 134-8 .....................................................................3, 20

Mass. Gen. Laws Ann. ch. 140, § 121 .....................................................3

Mass. Gen. Laws Ann. ch. 140, § 131M................................................3, 20

Md. Code Ann., Crim. Law §§ 4-301, *et seq.* ................................................20

N.J. Stat. Ann. § 2C:39-1(y) ................................................................3

N.J. Stat. Ann. § 2C:39-5(f) ..............................................................20

N.J. Stat. Ann. § 39-3(j) ...................................................................3

N.Y. Penal Law § 265.02(7) ...............................................................20

**Municipal Statutes, Codes & Ordinances**
Chicago, Ill. Muni. Code § 8-20-010 .....................................................3

Chicago, Ill. Muni. Code § 8-20-075 .....................................................3

City of Rochester, N.Y., City Code No. 47-5 ............................................3

Cook County, Ill. Muni. Code § 54-212 ..................................................3

D.C. Code § 7-2506.01 ....................................................................3

S.F. Police Code § 619 ............................................................... *passim*

Sunnyvale, Cal., Muni. Code § 9.44.050 ................................................3

**Constitutional Provisions**
U.S. Const., 2nd Amend. .............................................................. *passim*

**Other References**
Ayoob, *Gun Digest Book of Concealed Carry*, (2012 ed.) ..............................10

Barron, "Gunman Massacres 20 Children at School in Connecticut;
   28 Dead, Including Killer," *N.Y. Times*, Dec. 15, 2012 ...........................21

Blackstone, Sir William, Commentaries on the Laws of England  .....................24

Brady Ctr. to Prevent Gun Violence, *Assault Weapons: Mass Produced Mayhem*,
   Oct. 2008 ..........................................................................10

Cal. S.B. 396 (2012-13 Sess.) ...........................................................15

Clines, "Death on the L.I.R.R.: The Rampage; Gunman in a Train
   Aisle Passes Out Death," *N.Y. Times*, Dec. 09, 1993  ............................8

Cook, et al., "The Gun Debate's New Mythical Number: How Many Defensive Uses Per Year?,"
   *J. of Pol'y Analysis & Mgmt*, Vol. 16, No. 3, 1997  .............................5

Dolak & Weaver, "Woman Wrestled Fresh Ammo Clip from Tucson Shooter as
   He Tried to Reload," *ABC News*, Jan. 9, 2011 ...................................8

Edmund Mahoney, et al., "Sandy Hook Shooter's Paul May Have Aided Students' Escape,"
   *The Hartford Courant*, Dec. 23, 2012 ...........................................8

Firearms Tactical Institute, dated Apr. 1999 (book review *The Best Defense: True Stories of Intended Victims Who Defended Themselves with a Firearm,* Robert A. Waters .....................................9

Hemenway, *Private Guns Public Health* (2004) (2006 ed)........................................................6, 9

H.R. Rep. 103-489 (1994)........................................................................................2, 4, 17

Kleck, *Point Blank – Guns and Violence in America* (1991) (2009 ed.)........................................9

Mayors Against Illegal Guns, *Analysis of Recent Mass Shootings*, Sept. 2013 ...........................4

*Mass Shootings at Virginia Tech: Report of the Review Panel,* Aug. 2007 ..................................7

Pinkham, "Have Gun, Will Not Fear It Anymore," *Times-Union* (Jacksonville, Fl.), July 18, 2000.................................................................................................................9

*Report of the State's Attorney for the Jud. Dist. of Danbury on the Shootings at Sandy Hook Elementary School*, Nov. 25, 2013 ...................................................................................3, 7

Statement of Professors of Constitutional Law: The Second Amendment and the Constitutionality of the Proposed Gun Violence Prevention Legislation (Jan. 30, 2013) ..................................................................................................................18

Testimony of Laurence H. Tribe before Senate Judiciary Committee, Feb. 12, 2013 .................22

U.S. Dep't of Justice, *ATF Study on the Importability of Certain Shotguns*, Jan. 2011...............24

U.S. Dep't of the Treasury, *1989 Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles*, July 6, 1989 ..........2, 17

U.S. Dep't of the Treasury, *Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles*, Apr. 1998 .................................................................2

Violence Policy Center, *The Militarization of the U.S. Civilian Firearms Market*, June 2011 .......................................................................................................11, 20, 22

Wave3 (Indianapolis, IN) local news provider, May 18, 2004......................................................9

Weisman, "Senate Blocks Drive for Gun Control," *N.Y. Times*, Apr. 17, 2013 ............................3

Werner, "The Armed Citizen: A Five-Year Analysis," *Gunssavelives.net,* Mar. 12, 1012 ........10

**INTRODUCTION**

Large-capacity magazines make guns more deadly by allowing a shooter to fire a large number of bullets without pausing to reload. They have been shown in study after study to increase the lethality of criminal attacks where they are used, especially in public mass-shootings, yet all available empirical evidence shows that they are almost never used for self-defense purposes. For that reason, they have been restricted in many jurisdictions, including in the State of California since 2000 under a law that Plaintiffs do not challenge here.

The Second Amendment is compatible with the reasonable regulation of firearms. Under the test applied by nearly all circuits since *Heller v. District of Columbia*, 554 U.S. 570 (2008), including the Ninth Circuit, intermediate scrutiny is appropriate for most firearms regulations except those that lay a heavy burden on the core right to keep and bear arms for self-defense. San Francisco's Police Code § 619 is not such a regulation. It leaves San Franciscans free to defend themselves with any gun of their choosing and limits only the kind of magazine they use to equip that gun. Because this insubstantial burden serves San Francisco's objective of reducing the supply and use of a deadly item, San Francisco's large-capacity magazine ban is constitutional. This Court should deny Plaintiffs' request for a preliminary injunction.

**STATEMENT OF FACTS**

Large-capacity magazines ("LCMs") are detachable ammunition boxes or drums that contain more than 10 rounds of ammunition and feed that ammunition into a semiautomatic firearm, whether a handgun or a long gun. S.F. Police Code § 619(b) (Declaration of Christine Van Aken ("Van Aken Dec."), Ex. 1); Declaration of Christopher S. Koper ("Koper Dec.") ¶ 5. A semiautomatic firearm fires one bullet for each pull of the trigger and then automatically loads the next round in preparation for the next shot. *Id.* at 3 n.5. Semiautomatic firearms that accept a detachable magazine can be equipped either with an LCM or with a standard-capacity magazine containing 10 rounds or fewer. S.F. Police Code § 619(a)(4); Declaration of SFPD Captain David S. Lazar ("Lazar Dec.") ¶ 10.

**I.      History of Large-Capacity Magazine Restrictions**

Large-capacity magazines have been extensively regulated in the United States for decades. In 1989, the U.S. Department of the Treasury, charged with developing guidelines for which firearms

could be imported into the United States, determined that the ability to accept a large-capacity detachable magazine was a signature characteristic of military firearms, and that detachable LCMs did not serve any sporting purpose.  U.S. Dep't of the Treasury, *1989 Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles*, July 6, 1989, at 6[1] (Van Aken Dec., Ex. 2); U.S. Dep't of the Treasury, *Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles*, Apr. 1998, at 3 (Van Aken Dec., Ex. 3).  It prohibited importation of certain rifles on the basis of that and other findings detailed in its reports.  Koper Dec. ¶ 38 n.18.

During the 1980s and 1990s, assault weapons were used in a number of notorious mass shootings, including several in California.  Koper ¶ 9.[2]  Concerned about these events and increasing reports of drug dealers and other criminals using assault weapons and LCMs, Congress passed the federal Violent Crime Control and Law Enforcement Act, in September 1994.  *See* H.R. Rep. 103-489, at 32-33 (1994) (Van Aken Dec., Ex. 4).  This statute prohibited the possession or transfer of all "large-capacity ammunition feeding devices," defined as those with the capacity to accept more than 10 rounds, except those lawfully possessed at the time of the bill's enactment.[3]  *See* Pub. L. 103-322, Sept. 13, 1994, 108 Stat. 1796, 1998-2000 (formerly codified at 18 U.S.C. § 922(w)).  The law, which also prohibited the possession or transfer of assault weapons (except for those manufactured before 1994) expired by its own terms in 2004.  *Id.*, 108 Stat. at 2000.

But in 2000, before the federal ban expired, California adopted its own legislation prohibiting the manufacture, import, keeping or offering for sale, giving, or lending of large-capacity magazines.  Cal. Stats. 1999, ch. 129, §§ 3, 3.5 (Ex. 5 to Van Aken Dec.), presently codified at Cal. Penal Code § 32310.  This prohibition is more restrictive than the federal ban in that it does not permit people who lawfully possessed large-capacity magazines in 2000 to transfer them within California.  Thus, under the combined effect of federal and state law, the only large-capacity magazines that are lawfully

---

[1] All exhibit page references are to the document's internal pagination, where available.

[2] The term "assault weapons" generally includes semiautomatic pistols, rifles, and shotguns with military features.  *See* Koper Dec. ¶ 6 n.6.

[3] Plaintiffs contend that San Francisco's use of the term "large-capacity magazines" in its ordinance and presumably in this brief is "pejorative[]" and that this is a "term[] of opprobrium."  Br. at 5:5-8.  But the term is a common one that has been used in federal and state law for decades.

possessed in San Francisco by civilians were manufactured before 1994 and acquired by someone living in California before 2000, or by someone in connection with law enforcement service between 2000 and the present.  The City is aware of no estimates of how many large-capacity magazines are lawfully possessed in San Francisco, but they are surely few.  *See* Zimring Decl. ¶ 14.

The federal government, California, and San Francisco are not alone in restricting the supply of large-capacity magazines.  Prior to 2013, at least eight other jurisdictions restricted the possession or sale of ammunition magazines on the basis of capacity.[4]  In 2013, after the horrific December 2012 Sandy Hook Elementary School shooting, in which 20 first-graders were murdered by a shooter armed with an assault weapon and several large-capacity magazines,[5] four states and several local governments tightened their LCM restrictions or enacted new restrictions.[6]  The United States Congress also considered two bills to restrict large-capacity magazines, but these bills failed.  *See* Weisman, "Senate Blocks Drive for Gun Control," *N.Y. Times*, Apr. 17, 2013 (Van Aken Dec., Ex. 16).  Many of the restrictions that states successfully enacted have been challenged by gun-rights advocates in court, but all have withstood these challenges to date.  *See infra* Section II.A.

---

[4] *See* Haw. Rev. Stat. § 134-8(c) (prohibiting possession of LCMs capable of use with pistols); Mass. Gen. Laws Ann. ch. 140, §§ 121, 131M (enacted as 1998 Mass. Stats. ch. 180, § 8) (prohibiting sale or possession of LCMs); 2002 Md. Sess. Laws ch. 26, § 2 (excerpted at Van Aken Dec., Ex. 6, at 2) (prohibiting sale of magazine with capacity of more than 20 rounds); N.J. Stat. Ann. §§ 2C:39-1(y), 39-3(j) (prohibiting possession of magazines with capacity of more than 15 rounds except magazines grandfathered under 1990 law); 2000 N.Y. Sess. Laws ch. 189, § 11 (Van Aken Dec., Ex. 7, at 14) (prohibiting LCMs except those manufactured before September 13, 1994); City of Rochester, N.Y., City Code No. 47-5 (prohibiting possession of pistol magazines containing more than 17 rounds or rifle magazines containing more than five rounds) (Van Aken Dec., Ex. 8, at 4, 7); D.C. Code § 7-2506.01 (prohibiting possession of LCMs); Chicago, Ill. Muni. Code §§ 8-20-010, 8-20-075 (prohibiting possession of magazines with capacity greater than 15 rounds) (Van Aken Dec., Ex. 9).

[5] *See* Report of the State's Attorney for the Jud. Dist. of Danbury on the Shootings at Sandy Hook Elementary School, Nov. 25, 2013 ("*Sandy Hook Report*"), at 1-2 (Van Aken Dec., Ex. 10).

[6] *See* 2013 Colo. Stats. H.B. 13-1224 (Van Aken Dec., Ex. 11) (prohibits magazines with capacity to hold more than 15 rounds; grandfathers previously possessed magazines); 2013 Conn. Acts P.A. 13-3, § 23 (Reg. Sess.) (Van Aken Dec., Ex. 12) (prohibits LCM possession except those owned prior to the ban and registered with state authorities); 2013 Md. Sess. Laws ch. 427, § 1 (Van Aken Dec., Ex. 13, at 15) (reducing magazine restriction to 10-round capacity); 2013 N.Y. Sess. Laws ch. 1, §§ 38, 41-b (Van Aken Dec., Ex. 14, at 20, 22) (prohibiting LCM possession; eliminating grandfathered exceptions); *see also* Sunnyvale, Cal., Muni. Code § 9.44.050 (prohibiting possession of LCMs) (Van Aken Dec., Ex. 15); Cook County, Ill. Muni. Code § 54-212 (prohibiting possession of LCMs).

## II.    The Use of Large-Capacity Magazines Increases the Lethality of Criminal Attacks

The case for restricting large-capacity magazines, as these many jurisdictions have done, is simple.  By increasing the number of bullets that a shooter can quickly and easily fire, these oversized magazines increase the potential lethality of criminal attacks.  S.F. Police Code § 619 (a)(5);  Koper Dec. ¶ 7; Declaration of Franklin E. Zimring ("Zimring Dec.") ¶¶ 16, 19; H.R. Rep. 103-489, *supra*, at 35.  It cannot be seriously disputed that a shooter using a semiautomatic weapon equipped with an LCM can fire off a large number of rounds faster than a shooter who must reload several times to achieve the same number of discharges.  *See* Declaration of Massad Ayoob ("Ayoob Decl.") ¶¶ 28-29.

No doubt for that very reason, large-capacity magazines are the accessory of choice for shooters bent on maximum destruction, such as Gian Luigi Ferri, who used semiautomatic pistols equipped with large-capacity magazines to kill nine people and wound six people at the San Francisco law offices of Pettit and Martin in 1993.  Koper Dec. ¶ 9.  Indeed, there is a remarkably high correlation between mass shootings and the use of LCMs.  *Id.* ¶¶ 9-10; Zimring Dec. ¶ 18.  In the last thirty years, in instances of mass shootings where the magazine capacity used by a killer could be determined, researchers found that 86% of the mass shootings involved a large-capacity magazine. Koper Dec. ¶ 14; *see also* Declaration of Lucy P. Allen ("Allen Dec.") at ¶ 17 (85% correlation).

Mass shootings involving LCMs are more lethal than other mass shootings.  In cases where an oversized magazine was used, an average of about four more people were killed in each shooting and an average of about nine more people were wounded compared to shootings using standard-capacity magazines.  Koper Dec. ¶ 20.  These differences are statistically significant.  *Id.*  Other studies have confirmed the dramatically enhanced violent power of LCMs.  Dr. Allen found an average of 22 fatalities or injuries per mass shooting with a large-capacity magazine compared to only nine without. Allen Dec. ¶ 14.  Another study found that use of LCMs and assault weapons in recent mass shootings was associated with a 151% increase in number of people shot and a 63% increase in deaths.  *See* Mayors Against Illegal Guns, *Analysis of Recent Mass Shootings*, Sept. 2013, at 3 (Van Aken Dec., Ex. 35).

The same pattern holds for other crimes.  Large-capacity magazines are disproportionately used in the murders of law-enforcement officers.  Prior to 2004, a time when about 20% of handguns

and long guns were equipped with LCMs, LCMs were used in somewhere between 31% to 41% of gun murders of police. Koper Dec. ¶ 18 & Ex. D at 160, 162. Indeed, across all kinds of gun attacks, those committed with semiautomatic weapons, including LCMs, tend to result in more shots fired, more people wounded, and more wounds per victim than attacks with other weapons. Koper Dec. ¶¶ 21-26. These results have been confirmed in multiple studies. *Id.* There is also evidence suggesting that the particularly large ammunition capacities of assault weapons, along with their military-style features, have special attraction for criminals, who purchase them at higher rates than those without criminal histories or arrest records. Koper Dec. ¶ 11 & Ex. C at 17.

Facing an offender equipped with a large-capacity magazine is a particularly dangerous event for a police officer. Lazar Dec. ¶ 8. When a shooter pauses, even briefly, to reload a weapon, police officers have the chance to take tactical action, such as by advancing or taking cover. A shooter who does not have to reload does not give police that opportunity. *Id.*; Van Aken Dec. Ex. 18 (media accounts where shooters were subdued by police or bystanders during reloading). The danger that LCMs pose to police officers in San Francisco is not hypothetical. San Francisco police officers have been shot at and murdered by shooters with LCMs. Lazar Dec. ¶¶ 8-9 & Ex. A.

In addition to the immense human toll of gun murders committed using LCMs, every act of gun violence results in high social costs. The lifetime medical costs per gunshot injury are nearly $30,000, and studies estimate the full societal costs from gun violence to be $1 million per shooting. Koper Dec. ¶¶ 53-54. If these estimates are correct, then even a 1% reduction in shootings nationally could result in hundreds of millions of dollars in savings. *Id.* ¶ 54.

**III.    Plaintiffs' Evidence Does Not Rebut This Showing of Increased Lethality**

To combat any claim that LCMs are more dangerous than standard-capacity magazines, Plaintiffs offer the declaration of criminologist Gary Kleck. Because this is the only evidence that Plaintiffs offer that relies on social science evidence, it bears special attention.

Dr. Kleck's work on guns and gun violence has been widely discredited in other contexts. He has famously estimated that 2.5 million Americans use a gun defensively against a criminal attacker each year. *See* Cook et al., "The Gun Debate's New Mythical Number: How Many Defensive Uses Per Year?", *J. of Pol'y Analysis & Mgmt*, Vol. 16, No. 3, 1997, at 463 (Van Aken Dec., Ex. 19). This

1    estimate, based on self-reported survey responses, is unreliable.  For instance, the survey numbers that

2    Dr. Kleck relied on show 132,000 perpetrators killed or wounded by defenders every year—

3    approximately the same number of people whom hospitals report were killed by gunshots or received

4    treatment for gunshot wounds each year.  *Id.* at 465.  It cannot be that every gunshot is a self-defense

5    gunshot.  Also according to these survey numbers, more guns are wielded to defend against rapes each

6    year than there are actual rapes or attempted rapes each year.  *Id.* at 466.  It turns out that asking

7    people about their subjective experiences of using guns is just not a very reliable social science

8    method.  For that reason, Dr. Kleck's claim about defensive gun use has been called an "outrageous

9    number" with "no reasonable basis."  *Id.* at 463 (internal quotation marks omitted).  "All attempts at

10   external validation [have] reveal[ed] it to be a huge overestimate."  Hemenway, *Private Guns, Public*

11   *Health*, 2004, at 67 (excerpt at Van Aken Dec., Ex. 20).

12          Dr. Kleck's analysis is no more reliable in this case.  His declaration attempts to show, for

13   instance, that LCMs are not often used in mass shootings, and he states that, of the 57 mass shootings

14   between 1994 and July 2014 that he studied, "no LCM was used in . . . 35 incidents (or about 61%)."

15   Kleck Dec. ¶ 14.  This is a deeply misleading assertion: A review of the appendix to Dr. Kleck's

16   declaration reveals that his dataset of mass shootings included only *three* incidents where a magazine

17   of standard capacity was used, 30 incidents where magazine capacity was *unknown*, and 22 incidents

18   where a large-capacity magazine was known to be used.  *Id.* at pp. 14-36.  In other words, when Dr.

19   Kleck tells the Court that LCMs were not used in 35 incidents, what he means is that either LCMs

20   were not used or magazine capacity was not reported.  If one only counts instances where magazine

21   capacity is known, the figure is 22 out of 25 incidents, or 88%.

22          Dr. Kleck also argues that magazine capacity does not make a difference because shooters in

23   mass killings do not achieve rates of fire that are any faster than they could achieve by reloading a new

24   magazine.  Kleck Dec. ¶¶ 18-19 & p. 13.  This, too, is specious.  Dr. Kleck bases his rate-of-fire

25   estimates on media accounts of the number of shots and the length of shooting.  But he includes in his

26   dataset several instances where the shooter was known not to have fired continuously but to have

27   walked from place to place during the event to seek out more victims, such as the 2012 Sandy Hook

28   Elementary School shooting and the 2007 Virginia Tech massacre.  *See Sandy Hook Report*, *supra*, at

1-2; *Mass Shootings at Virginia Tech: Report of the Review Panel*, Aug. 2007, at 27-28 (Van Aken Dec., Ex. 21).  Thus, even assuming that media accounts of the duration of events like these are reliable, Dr. Kleck's rate-of-fire estimate is simply not an approximation of how fast a mass shooter with a large-capacity magazine can fire.  And if it were, it would be contradicted by the account Plaintiffs offer from Massad Ayoob, who reports, "A highly skilled police officer or competitive shooter may be able to accomplish a reload in two seconds.  Most people take considerably longer; especially someone who is under the mental duress typically experienced during an attack."  Ayoob Dec. ¶ 27.  "By contrast, simply pulling the trigger again on a pistol that still has more ammunition in it can be accomplished in a fraction of a second."  *Id.* ¶ 28.

Most importantly, Dr. Kleck's central contention—that use of LCMs almost never makes a difference in the lethality of mass shootings—is wrong.  He asserts that magazine capacity makes a difference to injuries or deaths only where the shooter possesses only one gun and only one LCM, since shooters who have more than one gun or magazine could simply switch guns or magazines to keep firing.  Kleck Dec. ¶ 14.  He reports that there have been no such cases since 1994.  *Id.*  There are many problems with this analysis.  First, Dr. Kleck is wrong that shooters infrequently have only one gun; Dr. Lucy Allen's analysis showed a single gun in 41% of mass shooting incidents.  Allen Dec. ¶ 17.  Dr. Kleck apparently used an incomplete dataset, as he did not include a number of the single-gun incidents that Dr. Allen found using the very well-publicized *Mother Jones* dataset.  *Compare* Allen Dec. table 1 (listing, for example, single-gun shootings in 2013 in Hialeah, Florida; and Herkimer, New York) *with* Kleck Dec. at p. 35 (reporting no mass shootings in 2013).  Second, Dr. Kleck offers no reason why it is just as fast to switch guns or magazines as it is to keep shooting with the same magazine, and the Ayoob Declaration contradicts that view.  Ayoob Dec. ¶¶ 27-28.  Third, Dr. Kleck misses the forest for the trees:  His narrow criteria for when an LCM matters *exclude the single incident where he admits that a shooter was tackled while reloading*—that is, where actual events proved that magazine capacity mattered—because that shooter had three guns and three LCMs.  Kleck Dec. ¶ 15; *id.* at p. 17.  Plainly, real life demonstrates that Dr. Kleck's criteria for materiality of LCM use are too narrow.

And indeed, real life demonstrates this in many more instances.  The shooter who wounded Gabrielle Giffords and killed six others, including a federal judge, was tackled by bystanders while he was reloading, according to first-hand accounts of the incident.  Dolak & Weaver, *Woman Wrestled Fresh Ammo Clip from Tucson Shooter as He Tried to Reload*, ABC News, Jan. 9, 2011 (Van Aken Decl., Ex. 22).[7]  In addition to the 1998 Oregon mass shooting where Dr. Kleck acknowledges the shooter was subdued while reloading, Kleck Dec. ¶ 15, the 1993 Long Island Railroad commuter train shooter was tackled as he attempted to load a fresh 15-round LCM in his pistol.  *See* H.R. Rep. No. 103-322, *supra*, at 33.[8]  And law enforcement sources have stated that a half-dozen children may have been able to escape from Sandy Hook Elementary School while the shooter was switching magazines. Mahoney *et al*., "Sandy Hook Shooter's Pause May Have Aided Students' Escape," *Hartford Courant*, Dec. 23, 2012 (Van Aken Dec., Ex. ) at 1;[9] *see also* Declaration of John J. Donohue III ("Donohue Decl.") ¶ 11 & n.4 (families estimate 11 children saved during Newtown shooter's reloading).

Mass shootings are not the only instances where a killer's pause to reload has saved lives.  In less well-known incidents where multiple bullets are fired but fatalities are fewer, there are many occasions where shooters have been subdued while reloading.  *See* Van Aken Dec., Ex. 18 (media reports concerning 42 such incidents).  In a case challenging New York State's LCM ban last year, Dr. Kleck filed a declaration claiming, inconsistently with his declaration in this case, that he knew of only one mass shooting event where bystanders had intervened, the 1993 L.I.R.R. shooting described above, and that "[b]ystander intervention was feasible in that case *only because of its unique location*," *i.e.* on a train where bystanders were forced to remain close to the shooter.  Declaration of Gary Kleck, Dkt. 23-9, *NYSRPA v. Cuomo*, Civil No. 1-13-cv-00291, at 4 (Van Aken Dec., Ex. 38) (emphasis added).  The 42 accounts San Francisco has located where bystanders or police intervened during a

---

[7] Notably, this event, too, is excluded from Dr. Kleck's account of cases where LCM use was material because the shooter had four magazines.

[8] This shooter had multiple magazines as well.  *See* Clines, "Death on the L.I.R.R.," *New York Times*, Dec. 9, 1993 (Van Aken Dec., Ex. 23).[9] These officials attributed the children's escape either to the shooter's pause to reload or to a jammed rifle.  But the rifle was later tested and functioned properly.  *Sandy Hook Report, supra*, 22.

[9] These officials attributed the children's escape either to the shooter's pause to reload or to a jammed rifle.  But the rifle was later tested and functioned properly.  *Sandy Hook Report, supra*, 22.

shooter's reloading, in a wide variety of locations, demonstrates that Dr. Kleck's understanding is deeply mistaken.

Finally, Dr. Kleck offers no evidence to contradict Dr. Koper's and Dr. Allen's empirical evidence that mass shootings with LCMs, or indeed any kinds of crimes committed with LCMs, result in more fatalities and more injuries than with standard-capacity magazines.

## IV.  Large-Capacity Magazines Are Not Useful for Self-Defense in the Home

There is no credible evidence whatsoever that prohibiting San Franciscans from using large-capacity magazines will impact their ability to defend themselves.  The direct case that Plaintiffs make that civilians need military or police firepower in the home is based solely on a handful of anecdotes from across the country, most of them decades old, some of them involving police action or offensive action by the shooter, and nearly all occurring outside the home.  *See* Ayoob Decl. ¶¶ 5-9 & n.3; Van Aken Dec., Exs. 25 (Gonzalez account: 1997); 26 (Neel account: 1994; Neel decided to come to the aid of a police officer); 27 (Honeycutt account: 2004; Honeycutt fired 15 rounds at close range into someone who "approach[ed] with a gun).

But Plaintiffs present no evidence whatsoever that such occurrences are widespread, and the great weight of the evidence is to the contrary.  Even Dr. Kleck has admitted elsewhere that most criminal uses of guns, and most defensive uses of guns, result in few if any shots fired.  Kleck, *Point Blank: Guns & Violence in America* (1991) (2d paperback ed. 2009), at 111 (Van Aken Dec., Ex. 28) ("Only a tiny fraction of criminal gun assaults involves anyone actually being wounded, even nonfatally, and one would expect the same to be true of defensive gun uses").[10]  Gun-rights supporters maintain databases of "self-defense stories" to illustrate the need for firearms in the home, but these stories only illustrate that rarely are more than a few shots fired.  Allen Dec. ¶ 7.  Dr. Allen's analysis of this database for the last three years showed an average of 2.1 bullets fired by defenders, and there were *no* incidents where the defender reporting firing more than 10 bullets.  *Id.* ¶ 9.  And an analysis of earlier "self-defense stories" printed on a pro-gun website reported that "the average and median

---

[10] Dr. Kleck is reported elsewhere by Harvard public health specialist David Hemenway as stating, "There is little or no need for a gun for self-protection [for most Americans] because there's so little risk of crime.  People don't believe it, but it's true.  You just can't convince most Americans they're not at serious risk."  Hemenway, *Private Guns, supra*, at 64.

number of shots fired was 2," and that "[r]eloading was required in only 3 incidents," one of which involved an escaped lion.  Werner, *The Armed Citizen: A Five-Year Analysis* (Van Aken Dec., Ex. 29, at 3-4).  Even where a defender faced multiple offenders, only a few shots were needed.  In fact, "[t]he most common responses of criminals upon being shot were to flee immediately or expire.  With few exceptions, criminals ceased their advances immediately upon being shot. Even small caliber handguns displayed a significant degree of instant lethality (30 per cent immediate one shot kills) when employed at close range."  *Id.* at 4.  Plaintiffs' witness Massad Ayoob has said much the same thing.  Although the declaration he filed in this case insists that LCMs are needed for self-defense, in his 2012 book, the *Gun Digest Book of Concealed Carry*, Ayoob writes, "The bottom line is, it's not about 'what gun you have,' so much as it's about 'did you have a gun?'"  (Van Aken Dec., Ex. 30.)

Indeed, LCMs can be a hazard to bystanders when employed by home defenders.  As one police official said, "because of the potential harm to others in the household, passersby, and bystanders, too much firepower is a hazard.  Indeed, in most self-defense scenarios, the tendency is for defenders to keep firing until all bullets have been expended."  Brady Ctr. to Prevent Gun Violence, *Assault Weapons: Mass Produced Mayhem*, 2008, p. 16 (Van Aken Dec., Ex. 31); *see* Lazar Dec. ¶ 6.

The risk that home defenders will fire too many shots with LCMs seems to be one that Plaintiffs obliquely admit when they argue that home defenders need LCMs because they miss so often.  Dr. Kleck cites a study that police have a rate of hitting their targets 37%, and argues that home defenders need LCMs because they will miss at comparable rates.  Kleck Dec. ¶ 23.  The fact that a person misses a lot does not seem to be a very good reason to give him a magazine with more bullets.  But even if it were, Dr. Kleck's argument is just more speculation.  The 37% hit rate for police that he cites is not a per-bullet hit rate, it is a per-incident hit rate.  *Id.*  There is no reason why the per-bullet hit rate for civilians would be the same as the per-incident hit rate for officers.  That is especially true because police officers often fire in difficult circumstances, such as while chasing a fleeing felon, that would not occur in home defense.  Lazar Dec. ¶ 7.  And in any event, even if Kleck were correct that a civilian is likely to miss with 63% of his bullets, he is still likely to hit a target with a legal 10-round magazine.  Kleck has to hypothesize *four or more* attackers to arrive at a scenario where a standard magazine is insufficient, Kleck Dec. ¶ 23, but he offers no evidence that this is a realistic prospect.

**V.    Plaintiffs Fail to Show that Large-Capacity Magazines Are in Common Use for Self-Defense**

Plaintiffs contend that large-capacity magazines are popular and widespread based on two kinds of evidence:  First, they point to many kinds of popular handguns and long guns that are sold standard with large-capacity magazines, Monfort Dec. Exs. B-D; and second, they offer the declaration of James Curcuruto, an analyst for a gun-industry group.  This evidence does not establish their point.

Mr. Curcuruto submits a declaration that purports to attach a report describing his estimate that there are 75 million LCMs in private hands in America.  Dkt. 18.  No such report is attached.  Perhaps Mr. Curcuruto meant to include an exhibit that he filed in a case challenging Sunnyvale's LCM prohibition.  Van Aken Dec., Ex. 32.  But if so, this exhibit is purely conclusory.  While federal data provides an aggregate number of long guns and handguns sold, it does not disaggregate the numbers of each make or model sold, nor does Mr. Curcuruto explain how "[f]irearms industry professionals" then attributed numbers of each magazine to the firearms sold.  Curcuruto Dec. ¶¶ 11-12.  This self-serving estimate deserves little weight.  Nor is it probative that Plaintiffs have identified a lot of advertisements for guns that are sold standard with LCMs in firearms catalogs.  Monfort Dec., Exs. B-D.  None of that establishes the actual number of those guns that are sold, and in any event those guns are not sold with LCMs in California, where such sales have been illegal for nearly 15 years.  *See* Cal. Penal Code § 32310; Lazar Dec. ¶ 10.

Moreover, even if Plaintiffs were correct that 75 million LCMs are in private hands in this country, that still does not establish that LCMs are widely used for self-defense.  First, Plaintiffs offer no evidence directly establishing use for self-defense, and Plaintiffs' indirect evidence about the utility of LCMs for self-defense is dubious for the reasons discussed above.  Second, it is highly likely that LCM ownership is very concentrated.  Gun ownership in America has been dropping as a percentage of households for decades.  Donohue Dec. ¶¶ 3-5.  Yet gun sales have risen at the same time.  Donohue Dec. ¶ 7.  One trend driving these sales is the sale of more weapons, and more powerful weapons, to a smaller group of gun enthusiasts.  *See generally* Violence Policy Center, *The Militarization of the U.S. Civilian Firearms Market*, June 2011 (Van Aken Dec., Ex. 33); Donohue

Dec. ¶¶ 6-8.  And studies directly show that gun ownership itself is very concentrated:  20% of gun owners possess 65% of the nation's guns.  *Id.* ¶ 6.  Thus, it is likely that LCMs are similarly collected by a small number of enthusiasts, and there is no evidence to indicate that they are widely popular, much less in common use for the purpose of self-defense.  *Id.* ¶¶ 9-10.

## ARGUMENT

The Second Amendment right is *not* "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Heller*, 554 U.S. at 626.  Instead, "[s]tate regulation under the Second Amendment has always been more robust than of other enumerated rights."  *Kachalsky v. County of Westchester*, 701 F.3d 81, 100 (2d Cir. 2012).  "[W]hen the fledgling republic adopted the Second Amendment, an expectation of sensible gun safety regulation was woven into the tapestry of the guarantee."  *Nat'l Rifle Ass'n v. Bureau of Alcohol, Tobacco & Firearms*, 700 F.3d 185, 200 (5th Cir. 2012).

Even as the Supreme Court recognized that the individual right to keep and bear arms applies to state and local laws, it acknowledged that "state and local experimentation with reasonable firearms regulation will continue under the Second Amendment."  *McDonald v. City of Chicago*, 561 U.S. --, 130 S. Ct. 3020, 3046 (2010) (quotation marks omitted).  Lower courts have heeded that admonition by keeping familiar firearms laws intact, and only striking down extreme restrictions that make it substantially more difficult to keep a handgun or long gun in the home for self-defense.  *See, e.g.*, *Ill. Ass'n of Firearms Retailers v. City of Chicago*, -- F. Supp. 2d --, 2014 WL 31339 (N.D. Ill. Jan. 6, 2014) (striking city regulation prohibiting all sales of firearms).

This is not such a case.  Large-capacity magazine restrictions are a familiar and widespread form of regulation that protect against real and proven harms.  And because LCMs have little to no value for self-defense, LCM restrictions have no appreciable impact on the ability of citizens to defend themselves in the home or elsewhere.  The Ninth Circuit has held that the proper evaluation of firearms laws under the Second Amendment first asks whether the restricted item is protected at all and then, if it is protected, to apply intermediate or strict scrutiny depending on how close the restriction comes to the core of Second Amendment rights and the degree of the burden it imposes.  *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013).  Because Police Code § 619 imposes very

little burden on Plaintiffs' rights, leaving them able to use any semiautomatic weapon they choose so long as that weapon is equipped with a magazine of 10 rounds or less, it should be evaluated under intermediate scrutiny.  Police Code § 619 readily passes that scrutiny.  Indeed, it is arguable that LCMs are not protected items at all under the Second Amendment.

Plaintiffs argue for Police Code § 619's unconstitutionality by largely ignoring *Chovan* and advancing an interpretation of *Heller* that no court has adopted.  They argue that any firearm (or, presumably, a firearm accessory like a magazine) that is in "common use" may not be prohibited, full stop.  But *Heller* does not support this approach.  *Heller*'s "common use" test is a test for whether the firearm is protected at all.  554 U.S. at 627.  *Heller* does not say that all "common use" firearms are immune from regulation, as Plaintiffs contend.

Finally, Plaintiffs are not entitled to a preliminary injunction on this record.  Even assuming that the deprivation of a large-capacity magazine causes them irreparable harm, despite the continuing availability of many other firearms and accessories, their merits showing is so weak, and the balance of equities so strongly in San Francisco's favor, that this Court should deny relief.

## I.   Preliminary Injunction Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Natural Res. Defense Council*, 555 U.S. 7, 24 (2008).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Id.* at 20.  A plaintiff who has proved likely irreparable harm and raised serious questions going to the merits may obtain an injunction if the balance of hardships tips sharply in the plaintiff's favor.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

## II.   Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims.

### A.   Intermediate Scrutiny Should Apply Because the LCM Ban Does Not Impact Plaintiffs' Ability to Defend Themselves in the Home or Elsewhere.

With *Chovan*, 735 F.3d 1127, the Ninth Circuit adopted the approach to evaluating Second Amendment claims after *Heller* that the majority of circuits have adopted.[11]  In light of the Supreme

---

[11] The Second Circuit applies rational basis review to firearms restrictions that do not substantially burden the Second Amendment right.  *See infra* n.18.

Court's admonition that not all arms are protected by the Second Amendment, *see Heller*, 554 U.S. at 1133, the first step of this test is to determine "'whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee.'"  *Chovan*, 735 F.3d at 1134 (quoting *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010)); *id.* at 1136 (adopting test articulated in *Marzzarella*).  If the challenged law in fact burdens conduct protected by the Second Amendment, the court then selects an appropriate level of scrutiny, which "depend[s] on 'the nature of the conduct being regulated and the degree to which the challenged law burdens the right.'"  *Id.* at 1138 (quoting *Chester*, 628 F.3d 673, 682 (4th Cir. 2010).  The closer the law comes to burdening the core of the Second Amendment right—"the right of law-abiding, responsible citizens to use arms in defense of hearth and home," *Heller*, 554 U.S. at 635—the greater scrutiny it should draw.  But a law that permits armed self-defense in the home and merely regulates some types of arms, leaving a person "free to possess any otherwise lawful firearm," operates like a "regulation of the manner" in which persons may lawfully exercise their Second Amendment rights, and is therefore subject only to intermediate scrutiny.  *Marzzarella*, 614 F.3d at 97 (cited with approval in *Chovan*, 628 F.3d at 1138); *see also Nat'l Rifle Ass'n*, 700 F.3d at 195 (applying intermediate scrutiny to ban on some handgun sales to young adults); *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc).

   *Chovan* evaluated the constitutionality of a complete ban on firearms possession for domestic violence misdemeanants, 18 U.S.C. § 922(g).  It is difficult to imagine a more complete abrogation of the right to bear arms for those affected by § 922(g), and *Chovan* made clear that domestic violence misdemeanants were not completely excluded from claiming Second Amendment protection.  628 F.3d at 1137.  But because they were not law-abiding citizens, their rights were outside the core of that protection, and *Chovan* applied only intermediate scrutiny to the law disarming them, notwithstanding the "quite substantial" degree of the burden they bore.  *Id.* at 1137-38.

   By articulating a two-part test—looking both to the degree of the burden, and the burden's proximity to the core of the right—*Chovan* teaches that only where a law *significantly* burdens the core Second Amendment right to keep and bear arms in the home will strict scrutiny apply.  *Id.* at 1138.  Otherwise, *Chovan* would have had no reason to articulate a two-part test, and could have rested on the fact that domestic violence misdemeanants were not law-abiding citizens.

Even assuming Plaintiffs' Second Amendment rights are impacted at all by San Francisco's LCM ban, *but see infra* Section II.D., intermediate scrutiny is the appropriate level of scrutiny to apply under the *Chovan* test, for two reasons. First, the LCM ban indirectly impacts conduct within the home but does not single out home defense for its zone of regulation. *See* S.F. Police Code § 619(c) (banning possession of LCMs regardless of location).[12] Thus, it does not discriminate against the conduct at the zenith of the Second Amendment's protection. *Cf. Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (content-based discrimination requires strict scrutiny under the First Amendment).

More importantly, the degree of burden that the LCM ban imposes on Plaintiffs' ability to defend themselves in the home with firearms is so modest that intermediate scrutiny must apply here. Although Plaintiffs claim on page 2 of their brief ("Br.") that San Francisco's ban is "at the extreme end of the gun control continuum," a footnote on the same page acknowledges the reality that the State of California has prohibited the manufacture or sale of LCMs for fourteen years. Br. at 2 n.1 (citing Cal. Penal Code §§ 32310, 32400-32450). Plaintiffs do not challenge California's laws, but those laws prevent most people who did not own an LCM in 2000 from acquiring one. Assuming they own LCMs legally as they aver, Plaintiffs are the beneficiaries of a grandfathered exemption, not representatives of the interests of most Californians. *See* Zimring Dec. ¶ 14. Far from being an extreme example of gun control, San Francisco's ordinance merely closes a loophole in a longstanding state law that state actors have been unable, as yet, to muster the political will to close.[13]

But even if California had no prohibition on acquiring LCMs, and San Francisco stood alone, its ban would still be subject only to intermediate scrutiny because of the triviality of the ban's burden on self-defense. As discussed above at pages 9-10, there is simply no credible evidence whatsoever

---

[12] Plaintiffs do not say whether they are entitled under California to carry firearms openly or concealed in San Francisco, but Larry Barsetti is a retired law enforcement officer who has the right to carry firearms in public absent some disqualifying reason. Cal. Penal Code §§ 26300 *et seq.* The Ninth Circuit has not yet decided whether the Second Amendment's protections extend outside of the home at all, but other circuits that have considered this have determined that this conduct, if protected at all, is not at the core of the Second Amendment's concern. *Kachalsky*, 701 F.3d at 89; *Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013); *Drake v. Filko*, 724 F.3d 426, 430-31 (3d Cir. 2013). *But see Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012) (Illinois's prohibition on all public carrying of firearms was categorically unconstitutional).

[13] A bill to eliminate the state loophole for grandfathered large-capacity magazines passed the California Senate but failed in the California Assembly during the most recent legislative session. Cal. S.B. 396 (2012-13 Sess.)

1    that having a magazine with more than 10 rounds makes a home defender any safer, and in fact

2    oversized magazines can make home defense less safe by increasing the likelihood that a defender will

3    discharge more errant rounds and harm the innocent.  *See* Kleck ¶ 37 (asserting that 63% of home

4    defenders' shots will go astray); Lazar ¶¶ 5-6 (errant rounds create risks to bystanders).  Simply

5    because Plaintiffs can imagine a hyperbolic scenario where they may need large-capacity magazines to

6    defend themselves does not mean that these magazines are useful or necessary for self-defense.

7    Because the empirical evidence indicates that Plaintiffs can fully vindicate their right to self-defense in

8    the home using standard-capacity magazines in the vast run of circumstances they may encounter, any

9    burden on self-defense here is so minor that only intermediate scrutiny is warranted.

10       This conclusion is underscored by decisions from other circuits on which *Chovan* relies.  In

11   *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*"), the D.C. Circuit

12   considered the District of Columbia's prohibition on the possession of assault weapons and LCMs.

13   Applying the same two-step test first set out in *Marzzarella* and later adopted in this circuit in *Chovan*,

14   *Heller II* assumed that possession of LCMs and assault weapons was entitled to at least some Second

15   Amendment protection,[14] but held that the District of Columbia's ordinance was nonetheless subject to

16   intermediate scrutiny in light of the modest burden it imposed:

17           [W]e determine the appropriate standard of review by assessing how severely
18           the prohibitions burden the Second Amendment right.  Unlike the law held
             unconstitutional in *Heller*, the laws at issue here do not prohibit the possession
19           of 'the quintessential self-defense weapon,' to wit, the handgun.  554 U.S. at
             629, 128 S. Ct. 2783.  Nor does the ban on certain semiautomatic rifles prevent
20           a person from keeping a suitable and commonly used weapon for protection in
             the home or for hunting ....  Although we cannot be confident the prohibitions
21           impinge at all upon the core right protected by the Second Amendment, we are
             reasonably certain the prohibitions do not impose a substantial burden upon that
22           right.

23   670 F.2d at 1262.  Because "the prohibition of semi-automatic rifles and large-capacity magazines

24   does not effectively disarm individuals or substantially affect their ability to defend themselves," it is

25   akin to a regulation of the manner in which an individual may exercise Second Amendment rights.[15]

26   _____
     [14] *Heller II* declined to decide whether LCMs and assault weapons are protected by the Second
27   Amendment at all, stating "we cannot be certain whether these weapons are commonly used or are
     useful specifically for self-defense or hunting."  670 F.3d at 1261.

28       [15] *See also Hightower v. City of Boston*, 693 F.3d 61, 71 (1st Cir. 2012) ("large capacity
     firearm" was not a "weapon[] of the type characteristically used to protect the home").

It leaves open "ample alternative channels" for self-defense and is therefore subject only to intermediate scrutiny. *Id.* Applying that test, *Heller II* held that the District of Columbia's ordinance readily survived that burden. *Id.* at 1262-64. The D.C. Circuit's reasoning applies with full force here in light of the overwhelming empirical evidence that large-capacity magazines are almost never needed for self-defense in the home or elsewhere. Intermediate scrutiny is the appropriate test.

*Chovan* also extensively cites *United States v. Marzzarella*, 614 F.3d 85. *See Chovan*, 735 F.3d at 1136-38. *Marzzarella* held that the federal law criminalizing possession of firearms with obliterated serial numbers did not "severely limit the possession of firearms" and left the defendant free to possess any otherwise lawful firearm for self-defense. 614 F.3d at 97. It was subject only to intermediate scrutiny because it was not a prohibition on exercise of Second Amendment rights but instead regulated merely "the form in which that conduct occurs." *Id.* Here, too, San Francisco's LCM ban does not prohibit the use of broad classes of firearms but only limits the kind of magazine, and thus the number of bullets, that may be loaded in any otherwise lawful firearm at one time. It is a regulation that controls not whether someone can use a firearm in self-defense or not but instead how he may equip it. Under the reasoning of *Marzzarella*, it is subject only to intermediate scrutiny.

In fact, application of intermediate scrutiny here is consistent with every decision that San Francisco has located concerning the effect of LCM prohibitions, or assault weapons prohibitions,[16] on the right to keep and bear arms. Since 2008, in addition to the *Heller II* decision by the district and circuit courts of D.C., three federal district courts have refused to strike down prohibitions on LCMs and assault weapons. In *Tardy v. O'Malley*, Civil No. CCB-13-2861, the District of Maryland denied a TRO to opponents of Maryland's prohibition on possession of assault weapons and LCMs because it did not impinge on the plaintiffs' ability to carry handguns in the home or other long guns. Order & TRO Hr'g Tr. at pp. 66-71 (D. Md. Oct. 1, 2013) (Van Aken Dec., Exs. 34 and 35). *Tardy* applied the

---

[16] Cases discussing assault weapons regulations are relevant here because they, too, involve the regulation of arms that their proponents claim are in common use, yet which are regulated because they are unusually dangerous. *See, e.g.*, H.R. Rep. 103-489, *supra*. They are also relevant because one of the features that characterize assault weapons are their ability to accept LCMs. *See, e.g.*, U.S. Dep't of the Treasury, *1989 Report and Recommendation, supra*, at 6; *Robertson v. City & County of Denver*, 874 P.2d 325, 333 n.16 (Colo. 1994) ("Two salient features of assault weapons which make them particularly threatening are their capability for a rapid rate of fire"—a capability they share with all semiautomatic weapons—"and the ability to fire many rounds without reloading.").

1    same two-step test that *Chovan* adopted.  *See Tardy*, TRO Hr'g Tr. at p. 68 (citing *United States v.*

2    *Chester*, 628 F.3d 673 (4th Cir. 2010)); *Chovan*, 735 F.3d at 1136 (adopting *Chester*'s two-step test).

3    In *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, the Western District of New York granted

4    summary judgment in favor of the state on its LCM and assault weapons ban.  – F. Supp. 2d –, 2013

5    WL 6909955, at *12 (Dec. 31, 2013).  It held that intermediate scrutiny should apply to the ban

6    because prohibiting assault weapons and LCMs was akin to a time, place and manner restriction on the

7    use of firearms, leaving open ample alternative channels for self defense.  *Id.* at *13.  And it concluded

8    that the assault weapon and LCM ban was ultimately constitutional under intermediate scrutiny,

9    although it struck as arbitrary New York's limit on loading a magazine with more than seven rounds.

10   *Id.* at *14-*19.[17]  Finally, in *Kampfer v. Cuomo*, the Northern District of New York held that the

11   state's assault weapons ban did not substantially burden an individual's Second Amendment rights at

12   all in light of the number of alternative firearms available to him to use for self-defense, and thus

13   warranted no heightened scrutiny at all.  No. 6:13-cv-82 (GLS/ATB), 2014 WL 49961, at *5-*6

14   (N.D.N.Y. Jan. 7, 2014).[18]

15        Even before the United States Supreme Court recognized in 2008 that the Second

16   Amendment's protection could be claimed by individuals, many state courts had held that assault

17   weapons bans and large-capacity magazine bans were consistent with state constitutional guarantees of

18   an individual right to keep and bear arms.  *See Robertson v. City & County of Denver*, 874 P.2d 325,

19   332-33 & n.16 (Colo. 1994) (local assault weapons ban was a reasonable safety regulation in part in

20   light of "the ability [of assault weapons] to fire many rounds without reloading"); *Benjamin v. Bailey*,

21   662 A.2d 1226, 1232-35 (Conn. 1995) (state assault weapons ban was "reasonable regulation" of right

22   to bear arms); *Arnold v. Cleveland*, 616 N.E.2d 163, 164 n.1, 171-73 (Ohio 1993) (local assault

23

24        [17] The Second Circuit has a slightly different Second Amendment test than the two-step test
     adopted by most circuits.  The Second Circuit applies rational basis scrutiny to restrictions that do not

25   place "any marginal, incremental or even appreciable restraint on the right to keep and bear arms."
     *United States v. DeCastro*, 682 F.3d 160, 166 (2d Cir. 2012).  For restrictions that impose a greater

26   burden than that, the Second Circuit, like the Ninth, chooses a form of heightened scrutiny based on
     the degree of the burden and its proximity to the core of the right.  *See Kachalsky*, 701 F.3d at 93-94.

27        [18] *See also* Statement of Professors of Constitutional Law: The Second Amendment and the
     Constitutionality of the Proposed Gun Violence Prevention Legislation (Jan. 30, 2013) (Van Aken

28   Dec. Ex. 39) (submitted to Congress re: 2013 proposal to prohibit LCMs & assault weapons).

weapons ban, where assault weapons were defined in terms of their ability to accept 20+ round magazines, was constitutional); *Beaver v. City of Dayton*, No. 13871, 1993 WL 333641 (Ohio Ct. App. Aug. 30, 1993) (upholding municipal assault weapons regulation against state constitutional challenge); *Cincinnati v. Langan*, 640 N.E.2d 200, 206 (Ohio Ct. App. 1994) (upholding local ban on large-capacity magazines and semiautomatic weapons); *Oregon State Shooting Ass'n v. Multnomah County*, 858 P.2d 1315 (Or. Ct. App. 1993) (rejecting state constitutional challenge to regulation on sale of assault weapons). *Cf. Olympic Arms v. Buckles*, 301 F.3d 384 (6th Cir. 2002) (on equal protection challenge, finding federal assault weapons ban to serve rational basis; noting that ability to accept LCMs "makes a weapon potentially more dangerous"); *Kasler v. Lockyer*, 23 Cal.4th 472, 490-91 (2000) (rejecting equal protection challenge to California's assault weapons ban in light of dangerousness of assault weapons).[19]

Plaintiffs contend that, if this Court does not categorically invalidate San Francisco's LCM ban under *Heller* (a contention San Francisco rebuts in Section II.C., below), it should at least apply strict scrutiny under *Chovan* because the ban operates on self-defense within the home and "is particularly severe." Br. at 16:17-25. As for why this ban is "particularly severe," Plaintiffs reiterate that it operates in the home, Br. at 17:1, and then they contend that the impact of the ban is severe because it is a "government-imposed reduction on the ammunition capacity of citizens' commonly used firearms," where "millions of Americans routinely select *firearms capable of accepting more than ten rounds* for self-defense." Br. at 17:5-8 (emphasis added).

Plaintiffs do not explain how the number of people affected by a regulation is an indicator of how burdensome the regulation is for each person it affects. Perhaps Plaintiffs mean to argue that the popularity of "firearms capable of accepting more than ten rounds" demonstrates that they are useful for self-defense. Br. at 17:6. But notice what is missing from their argument: any claim that LCMs themselves, rather than *firearms capable of accepting LCMs*, are commonly selected by Americans for

---

[19] Long before the current controversy over LCM and assault weapons restrictions, states frequently prohibited entire classes of weapons, such as pistols or other concealable firearms, on the basis of their particular dangerousness. These regulations were upheld as reasonable even under state constitutional guarantees of an individual right to bear arms. *See generally* Brief for Professional Historians and Law Professors as *Amici Curiae*, *Heller v. District of Columbia*, D.C. Cir. No. 10-7036, at pp. 18-24 (Van Aken Dec., Ex. 40).

self-defense.  In fact, most semiautomatic handguns and rifles are capable of accepting many kinds of

magazines, including magazines of less than 10-round capacity.  *See* Koper Dec. ¶ 6; Lazar Dec. ¶ 10.

Plaintiffs' contention says only that Americans prefer semiautomatics.  And even if these millions of

Americans chose LCMs to equip their semiautomatics, that would not demonstrate that LCMs are

chosen *for self-defense* rather than for other purposes, like hunting, target practice, or competitive

shooting.  *See Heller II*, 670 F.3d at 1261.  But perhaps most importantly, while people may prefer

some kinds of firearms equipment over others, and may even believe that is in the service of self-

defense, this does not necessarily make it so.  Here, Plaintiffs argue nothing more than that the

possibility of "potentially deadly consequences in the event of a self-defense emergency," if LCMs are

not available to them, constitutes "a severe burden triggering strict scrutiny."  Br. at 17:9-10.  In short,

just the unrealistic possibility that they could someday require an exceptionally large magazine for

self-defense creates an entitlement to that magazine, in Plaintiffs' view, and they have no need to show

(and cannot show) that such a scenario is likely in even the smallest degree.

Under that view of the *Chovan* test, firearms law would look dramatically different than it does

today.  The LCM bans and assault weapons bans of California and eight other states would fail.[20]

Other familiar restrictions like bans on Saturday night specials or sawed-off shotguns would be in

doubt if their proponents could articulate any scenario where they might be useful for self-defense.

*See* Zimring Dec. ¶ 11.  And governments would have few tools to stop or slow an arms race of more

and more powerful weapons sold on civilian markets.  *See generally* Violence Policy Center, *The*

*Militarization of the U.S. Civilian Firearms Market*, *supra*.  Nothing in *Chovan* or *Heller* requires such

a result, in light of the overwhelming evidence that LCMs are unnecessary for effective self-defense.

### B.    The LCM Ban Is Constitutional Because It Advances San Francisco's Compelling Interest in Mitigating Gun Violence.

Under intermediate scrutiny, San Francisco's ban on possession of large-capacity magazines is

constitutional if "the government's stated objective [is] significant, substantial, or important; and

---

[20] For LCM bans, *see supra* at pp. 3-4.  For assault weapons bans, *see* Cal. Penal Code
§§ 30600 *et seq.*; Conn. Gen. Stat. § 53-202c; D.C. Code § 7-2502.02; Haw. Rev. Stat. Ann. § 134-8;
Md. Code Ann., Crim. Law §§ 4-301 *et seq.*; Mass. Gen. Laws Ann. ch. 140, § 131M; N.J. Stat. Ann.
§ 2C:39-5(f); N.Y. Penal Law § 265.02(7).

[there is] a reasonable fit between the challenged regulation and the asserted objective." *Chovan*, 735 F.3d at 1139. The LCM ban meets that test.

"The regulation of firearms is a paramount issue of public safety, and recent events . . . are a sad reminder that firearms are dangerous in the wrong hands. *Osterweil v. Bartlett*, 706 F.3d 139, 143 (2d Cir. 2013) (O'Connor, J.) (citing James Barron, *Gunman Massacres 20 Children at School in Connecticut; 28 Dead, Including Killer*, N.Y. Times, Dec. 15, 2012, at A1). Plaintiffs do not dispute that the public safety aims of Police Code § 619 are compelling, nor could they.

San Francisco's ban on large-capacity magazines bears a substantial relationship to this interest. LCM bans operate by decreasing the supply of LCMs that are available. When they are in effect long enough, they depress the supply of LCMs that are available for criminal uses. Koper Dec. ¶ 39. That, in turn, has been shown to have an effect on criminal uses of LCMs. *Id.* ¶¶ 45-51. Thus, Plaintiffs' argument that San Francisco's ban will be ineffective because it will affect only the law-abiding and not criminals, Br. at 21-22, misses the point. Koper Dec. ¶ 39.

Plaintiffs also criticize San Francisco's LCM ban because, they contend, the federal assault weapons ban and LCM ban did not impact crime. Br. at 19. But the only academic studies of that ban on which they rely were conducted by Dr. Koper, who believes that it had a limited but meaningful effect, and that its effect would have grown had it not grandfathered existing magazines and assault weapons and had it not expired after 10 years. Koper Dec. ¶¶ 45-52. Plaintiffs mischaracterize Dr. Koper's views by relying on his work to suggest otherwise. As he attests, Police Code § 619 is "a reasonable and well-constructed measure that is likely to advance San Francisco's interest in protecting its citizens and its police force," especially if it is "adopted in other jurisdictions as well." Koper Dec. ¶¶ 57-58.

In any event, the criticisms Plaintiffs mount of the LCM ban are ultimately disagreements with San Francisco's legislative choices. On intermediate scrutiny, courts defer to legislative judgments about whether a measure is substantially related to a compelling state goal. *Kachalsky*, 701 F.3d at 97; *see also United States v. Carter*, 669 F.3d 411, 418 (4th Cir. 2012). "In the context of firearm regulation, the legislature is 'far better equipped than the judiciary' to make sensitive policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat

those risks." *Kachalsky*, 701 F.3d at 97 (quoting *Turner Broad. Sys., Inc.* v. *FCC*, 512 U.S. 622, 665 (1994)).  Plaintiffs' evidence falls far short of overcoming San Francisco's reasoned legislative judgment here.

### C.  Plaintiffs Misread *Heller* When They Ask the Court to Strike Down Police Code § 619 Categorically

Plaintiffs contend that the LCM ban is categorically invalid because large-capacity magazines are "'typically possessed by law-abiding citizens for lawful purposes.'"  Br. at 9 (quoting *Heller*, 554 U.S. at 625).  Thus, they claim, this Court should treat it the same as the Supreme Court treated the District of Columbia's handgun ban in *Heller*, and strike it down without resort to any standard of review.  As discussed above at pages 11-12, Plaintiffs' evidentiary showing of the popularity of LCMs is speculative and says nothing about whether they are in common use for self-defense, particularly in California, where they have been illegal for purchase since 2000.  But more importantly, Plaintiffs misread *Heller* and the common-use test.

Under Plaintiffs' methodology, the test is this:  One looks for whether a firearm (or a firearm accessory, as here) is in "common use" by counting the numbers of that firearm or accessory in circulation.  Then, if the number is sufficiently high, the government either can *never* prohibit the sale of that firearm, no matter what dire harm it is someday is proven to cause, or the government can only prohibit its sale if that prohibition withstands strict scrutiny.

That would be a perverse test indeed.  For the government, it would give incentives to prohibit any new firearms technology as soon as it is developed, lest it become popular and thus unregulable, no matter what its consequences.  And it would put a great deal of power in the hands of firearms manufacturers to boost new products at any cost—including the militarized novelty products that that industry has focused on selling to committed gun owners as the number of gun-owning households in America has dropped, *see* Violence Policy Center, *The Militarization of the U.S. Civilian Firearms Market*, *supra*, at 1, 15, 40; Testimony of Laurence H. Tribe before Senate Judiciary Committee, Feb. 12, 2013, at 14 (Van Aken Dec. Ex. 36).  Such a test would also place the constitutionality of firearms prohibitions in the hands of enthusiasts who could determine the content of constitutional protections simply by stockpiling new items.  *Cf.* Donohue Decl. ¶ 8.

*Heller* does not demand such a strange test.  *Heller* explains, in Section III of the majority opinion, that "the right secured by the Second Amendment is not unlimited."  554 U.S. at 626.  To illustrate the limited nature of the right, *Heller* states that "nothing in our opinion should be taken to cast doubt on" a host of "presumptively lawful regulatory measures," *id.* at 626-27 & n.26, and that the Second Amendment does not protect all arms.  For example, the Second Amendment extends no protection at all to arms that are not "'in common use at the time.'"  *Id.* at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939); *see also* Tribe Testimony, *supra*, at 11 ("[T]he Court carefully frames the scope of the Second Amendment to cover *only* firearms 'in common use at the time.'").  Such arms can be entirely prohibited without further judicial inquiry.  *Heller*, 554 U.S. at 625.

But when, in the following Section IV, *Heller* applies these principles to the District of Columbia's handgun ban, it does *not* say the converse, *i.e.*, that arms in common use cannot be prohibited.  Instead, in striking down the handgun ban "[u]nder any of the standards of scrutiny that [the Court has] applied to enumerated constitutional rights," *Heller* emphasizes both the breadth of D.C.'s ban—"a prohibition of an entire class of 'arms'"—and how singularly well-suited handguns are for self-defense purposes.  554 U.S. at 628-29.  Indeed, *Heller* could hardly have emphasized the utility of handguns for self-defense more:  It calls them "the quintessential self-defense weapon," it lists the many reasons why people prefer handguns to long guns in the event of a self-defense emergency, it says they are "'the most preferred firearm in the nation,'" and it calls them "the most popular weapon chosen by Americans for self-defense in the home."  *Id.*

None of that is true of large-capacity magazines.  Police Code § 619 does not prohibit "an entire class of arms" but instead certain varieties of magazines, a type of equipment that can be used with many classes of arms.  All otherwise legal varieties of handguns and long guns remain available to Plaintiffs.  And far from being singularly well-suited to self-defense, large-capacity magazines are almost never useful in self-defense situations.

Moreover, even if large-capacity magazines were useful for self-defense, it would still be inappropriate to apply *Heller*'s categorical treatment of handgun prohibitions to Police Code § 619, because large-capacity magazines are not a class of arms at all.  *Heller* defined "arms" as "'weapons of offence, or armour of defence.'"  554 U.S. at 581 (quoting Samuel Johnson, 1 Dictionary of the

English Language 106 (4th ed.) (reprinted 1978)).  "Thus, the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'"  *Id.* at 582.  Large-capacity magazines are a piece of equipment used to make weapons more deadly; they are not themselves weapons and they are not an integral part of any weapon, since smaller magazines can also be used in their stead.  Prohibiting them does not categorically infringe the right to bear arms.

### D.       Alternatively, Large-Capacity Magazines Are Outside the Second Amendment's Protections Entirely.

"'Dangerous and unusual weapons'" are not protected by the Second Amendment at all. *Heller*, 554 U.S. at 627 (quoting 4 Blackstone's Commentaries 148-49 (1976)).  At least in California, where they have been prohibited for nearly 15 years except to law enforcement and those who owned them before the ban took effect, it is arguable whether large-capacity magazines are within the scope of the Second Amendment at all.  And Plaintiffs offer no evidence, beyond anecdote and speculation, that the purpose for which LCMs are possessed is self-defense or other lawful purposes.[21]

Large-capacity magazines show remarkable parallels with short-barreled shotguns.  The National Firearms Act of 1934 imposed a prohibitively high tax on guns with particularly dangerous features, including rifles with reduced barrels.  8 Stat. 1236 (26 U.S.C. §§ 5801-5821).  At the time, long guns were the most popular guns in circulation, constituting 74% of the guns manufactured during the first half of the 20th Century.  Zimring Dec. ¶¶ 10-11.  Thus, the National Firearms Act restricted citizens' ability to modify most privately owned guns to make them more dangerous.  *Id.* ¶ 11.  The Supreme Court upheld this provision against a Second Amendment challenge.  *United States v. Miller*, 307 U.S. 174, 183 (1939).  *Heller* later interpreted *Miller* as holding that the Second Amendment did not protect short-barreled shotguns at all because they were dangerous and unusual weapons.  554 U.S. at 625.

The parallels to this case are plain:  LCMs are equipment that can be used with semiautomatic weapons, which are popular firearms in their day, just as long guns were the essential firearm when

---

[21] LCMs are not useful for sporting purposes.  The majority of states prohibit their use in hunting, and federal agencies have consistently confirmed they are not well-suited for sporting purposes.  *See* U.S. Dep't of Justice, *ATF Study on the Importability of Certain Shotguns*, Jan. 2011, at 10, 16-18 (Van Aken Dec., Ex. 37).

*Miller* was decided.  Yet a modification to a popular firearm that makes it more dangerous—and that is commonly used for unlawful purposes but offers no advantage for nearly all lawful uses—is not protected by the Second Amendment at all.  This Court should reject Plaintiffs' challenge on this basis as well.

## III.   THE REMAINING PRELIMINARY INJUNCTION FACTORS FAVOR SAN FRANCISCO.

Plaintiffs contend that irreparable injury flows from the denial of their Second Amendment rights.  But in view of the speculative nature of their claims that LCMs are necessary for self-defense, they cannot show that they are likely to suffer irreparable harm if they must surrender their LCMs or store them outside of San Francisco while this lawsuit is pending.[22]  A speculative showing of harm is insufficient to obtain injunctive relief.  *Winter*, 555 U.S. at 20 (harm must be "likely").

For the same reasons, Plaintiffs have failed to establish that "the balance of equities tips in [their] favor, and that an injunction is in the public interest."  *Id.*  Like a host of other jurisdictions, including the State of California, San Francisco restricts the possession of large-capacity magazines in order to prevent their criminal use.  The compelling public safety interest underlying Police Code § 619 tips the equities decisively away from Plaintiffs.  This Court should deny Plaintiffs' motion.

Dated:  January 16, 2014                    DENNIS J. HERRERA
                                            City Attorney
                                            WAYNE SNODGRASS
                                            CHRISTINE VAN AKEN
                                            Deputy City Attorneys


                                    By:   s/*Christine Van Aken*
                                            CHRISTINE VAN AKEN
                                            Attorneys for Defendants CITY AND COUNTY OF
                                            SAN FRANCISCO, SAN FRANCISCO MAYOR
                                            EDWIN LEE, and SAN FRANCISCO POLICE CHIEF
                                            GREG SUHR

---

[22] If they surrender their LCMs and later win this case, but cannot buy new LCMs because of California's prohibition on the transfer of LCMs, that is a consequence of their failure to challenge the state ban and not something that can create irreparable harm here.

CCSF'S OPP. TO MPI                          25                          n:\govlit\li2013\140610\00897197.doc
CASE NO. CV 13-5351 WHA