1  DENNIS J. HERRERA, State Bar #139669
   City Attorney
2  WAYNE SNODGRASS, State Bar #148137
   CHRISTINE VAN AKEN, State Bar #241755
3  Deputy City Attorneys
   1 Dr. Carlton B. Goodlett Place
4  City Hall, Room 234
   San Francisco, California 94102-4682
5  Telephone:    (415) 554-4633
   Facsimile:    (415) 554-4699
6  E-Mail:       christine.van.aken@sfgov.org

7  Attorneys for Defendants
   CITY AND COUNTY OF SAN FRANCISCO,
8  SAN FRANCISCO MAYOR EDWIN LEE, and
   SAN FRANCISCO POLICE CHIEF GREG SUHR
9

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12

13 | SAN FRANCISCO VETERAN POLICE     | Case No. CV 13-5351 WHA
   | OFFICERS ASSOCIATION, LARRY      |
   | BARSETTI, RAINERIO GRANADOS,     | **CITY AND COUNTY OF SAN FRANCISCO'S**
14 | ARTHUR RITCHIE, and RANDALL LOW, | **STATEMENT OF RECENT DECISION**
                                       | **(CIVIL LOCAL RULE 7-3(d)(2))**
15        Plaintiffs,

16        vs.                           Hearing Date:   February 11, 2014
                                        Time:           10:00 a.m.
17 THE CITY AND COUNTY OF SAN          Place:          Courtroom 8, 19th Floor
   FRANCISCO, THE MAYOR OF SAN
18 FRANCISCO, EDWIN LEE in his official Date Action Filed:   Nov. 19, 2013
   capacity, THE CHIEF OF THE SAN      Trial Date:          None Set
19 FRANCISCO POLICE DEPARTMENT,
   GREG SUHR, in his official capacity, and
20 DOES 1-10,

21        Defendants.

22

23

24        Pursuant to Northern District of California Civil Local Rule 7-3(d)(2), defendants City and

25 County of San Francisco and its officials submit the attached recent decision in *Shew v. Malloy*,

26 United States District Court for the District of Connecticut, Civ. No. 3:13CV739(AVC). This decision

27 was issued on January 30, 2014, two weeks after defendants submitted their opposition to Plaintiffs'

28 motion for preliminary injunction. It is attached to this filing for the Court's convenience.

Dated:  February 4, 2014

DENNIS J. HERRERA
City Attorney
WAYNE SNODGRASS
CHRISTINE VAN AKEN
Deputy City Attorneys


By:  s/*Christine Van Aken*

CHRISTINE VAN AKEN
Attorneys for Defendants CITY AND COUNTY OF
SAN FRANCISCO, SAN FRANCISCO MAYOR
EDWIN LEE, and SAN FRANCISCO POLICE CHIEF
GREG SUHR

**EXHIBIT A**

**TO**

**CITY AND COUNTY OF SAN FRANCISCO'S
STATEMENT OF RECENT DECISION
(CIVIL LOCAL RULE 7-3(d)(2))**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JUNE SHEW, et al.,            :
  plaintiffs,                :
                             :
v.                           :   CIVIL NO: 3:13CV739(AVC)
                             :
DANNEL P. MALLOY, et al.,    :
  defendants.               :

RULING ON THE PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION AND THE
PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

    This is an action for a declaratory judgment seeking a determination as to the constitutionality of Connecticut's recent gun control legislation, which made several changes to the state's regulation of firearms. The plaintiffs[1] have filed a motion for a preliminary injunction (Doc. 14) and a motion for summary judgment[2] (Doc. 60). The defendants[3] have filed a cross-motion for summary judgment (Doc. 78).

    The instant action follows the enactment of Conn. P.A. 13-3, entitled "An Act Concerning Gun Violence Prevention and Children's Safety" (hereinafter "the legislation"), which became

---

[1] The named plaintiffs are June Shew, Mitchell Rocklin, Stephanie Cypher, Peter Owens, Brian McClain, Stephen Holly, Hiller Sports, LLC, MD Shooting Sports, LLC, the Connecticut Citizens' Defense League, and the Coalition of Connecticut Sportsmen.

[2] The motion requests declaratory judgment and permanent injunctive relief.

[3] The named defendants are Dannel Malloy, Kevin Kane, Reuben Bradford, David Cohen, John Smriga, Stephen Sedensky III, Maureen Platt, Kevin Lawlor, Michael Dearington, Peter McShane, Michael Regan, Patricia Froehlich, Gail Hardy, Brian Preleski, David Shepack, and Matthew Gedansky.

effective on April 4, 2013. It was thereafter amended by Public Act 13-220.[4]

The present action is brought pursuant to 28 U.S.C. §§ 2201, 2202, 42 U.S.C. § 1983 and equitable common law principles concerning injunctions. The issues presented are whether the legislation: 1) violates the plaintiffs' right under the Second Amendment to the U.S. Constitution to keep and bear arms;[5] 2) violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution;[6] and 3) contains portions that are unconstitutionally vague.[7]

At the outset, the court stresses that the federal judiciary is only "vested with the authority to interpret the law . . . [and] possess[es] neither the expertise nor the prerogative to make policy judgments." Nat'l Fed'n of Indep.

---

[4] The amendment covered, *inter alia*, "large capacity magazines," and became effective June 18, 2013.

[5] The Second Amendment provides: "A well regulated militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

[6] The Fourteenth Amendment provides in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

[7] With respect to this constitutional doctrine, the plaintiffs object to the following specific terms in numerous provisions of the legislation: 1) a grip allowing a non-trigger finger to be below the action when firing, Conn. Gen. Stat. § 53-202a(1)(E)(i)(II), (vi)(II); 2) "copies or duplicates" with the capability of other firearms in production by the effective date, Conn. Gen. Stat. § 53-202a(1); 3) inaccurately named firearms, Conn. Gen. Stat. §53-202a(1)(A)-(D); and 4) the modification, alteration, or assembly of magazines and components.

<u>Bus. v. Sebelius</u>, 132 S. Ct. 2566, 2579 (2012).  Determining "whether regulating firearms is wise or warranted is not a judicial question; it is a political one." <u>New York State Rifle & Pistol Ass'n, Inc. v. Cuomo</u>, 2013 WL 6909955 at *1 (W.D.N.Y. Dec. 31, 2013) (hereinafter "<u>NYSRPA</u>"). The Connecticut General Assembly has made a political decision in passing the recent gun control legislation.

The court concludes that the legislation is constitutional. While the act burdens the plaintiffs' Second Amendment rights, it is substantially related to the important governmental interest of public safety and crime control.[8] With respect to the equal protection cause of action, while the legislation does not treat all persons the same, it does not treat similarly situated persons disparately. Finally, while several provisions of the legislation are not written with the utmost clarity, they are not impermissibly vague in all of their applications and, therefore, the challenged portions of the legislation are not unconstitutionally vague.

Therefore, the plaintiffs' motion for summary judgment is DENIED and the defendants' cross-motion for summary judgment is

---

[8] Insofar as the court concludes that the weapons and magazines regulated are commonly used for lawful purposes, and that the legislation impinges upon a Second Amendment right, the analysis warrants intermediate rather than strict scrutiny.

3

GRANTED. The plaintiffs' motion for preliminary injunction is DENIED as moot.[9]

### FACTS

An examination of the pleadings, exhibits, memoranda, affidavits and the attachments thereto, discloses the following undisputed material facts:

On July 1, 2013, the Connecticut General Assembly passed Conn. P.A. 13-3, prohibiting, *inter alia*, the ownership of numerous semiautomatic firearms.[10]  The act followed the events of December 14, 2012, in Newtown, Connecticut, where a lone gunman entered a grade school and shot and killed 26 individuals, including 20 school children.

Building on previous legislation,[11] the definitional scope for an assault weapon has been expanded, including additional semiautomatic firearms.[12] However, the legislation does not

---

[9] Because the court grants the defendants' motion for summary judgment, the plaintiffs' motion for preliminary injunction is rendered moot.

[10] Citing Conn. Gen. Stat. § 53-202a(A)-(D), the defendants state "[a]s a result of the Act, there are now 183 assault weapons that are prohibited by make and model in Connecticut."

[11] In 1993, the Connecticut General Assembly passed Conn. 1993, P.A 93-306, which prohibited possessing, selling, or transporting, what the Act defined as "assault weapons," with limited exceptions.

[12]  Assault weapon is a term of common modern usage, without a universal legal definition. It is generally defined as "any of various automatic or semiautomatic firearms." See "assault weapon" *Merriam-Webster.com*, Merriam-Webster 2011. An "assault rifle" is generally defined as "a gun that can shoot many bullets quickly and that is designed for use by the military." See "assault rifle" *Merriam-Webster.com*, Merriam-Webster 2011.

prohibit bolt action rifles or revolvers,[13] nor most shotguns, all of which, subject to regulation, remain authorized.[14] Further, much of the legislation is not the subject of this litigation.[15]

### Assault Weapons

The legislation defines an assault weapon as any of a number of specifically listed makes and models[16] of semiautomatic centerfire rifles, semiautomatic pistols, or semiautomatic shotguns (collectively, hereinafter "semiautomatic firearms") "or copies or duplicates thereof with the capability of" such, that were in production prior to or on April 4, 2013.[17] In addition, the legislation bans an individual from possessing

---

[13] Bolt action rifles are not semiautomatic. Revolvers, which use multiple chambers and a single barrel, are also not semiautomatic.

[14] The legislation prohibits roughly 2.5% of the gun stock in the United States. Professor Laurence Tribe, in testimony before the Senate Judiciary Committee stated that "depending upon the definition of assault weapon, assault weapons represent 15% of all semi-automatic guns owned in the U.S., which in turn represent about 15% of all firearms owned in the U.S." That is, 15% of 15%, or 2.5%. See Prepared Testimony by Laurence H. Tribe, exhibit 61 at p. 24.

[15] For example, not contested is Section 66 of Public Act 13-3, which "established a task force to study the provision of behavioral health services in the state with particular focus on the provision of behavioral health services for persons sixteen to twenty-five years of age, inclusive." Conn. P.A. 13-3, § 66(a), eff. April 4, 2013; as amended by Conn. 2013 P.A. 13-220.

[16] For example, AK-47 rifles, Centurion 39 AK pistols, and IZHMASH Saiga 12 shotguns are among the specifically listed firearms.

[17] See Conn. Gen. Stat. § 53-202a(1)(B)-(D).

parts of an assault weapon that can be "rapidly" put together as a whole assault weapon.[18]

The legislation further provides that a firearm can qualify as an assault weapon even if it is not specifically listed in the statute as long as it meets one of several criteria. This is sometimes referred to as the "one-feature" test.[19] Under this test, an assault weapon is "[a] semiautomatic, centerfire rifle that has an ability to accept a detachable magazine" and has either:

> (I)     A folding or telescoping stock;
> (II)    Any grip of the weapon, including a pistol grip, a thumbhole stock, or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing;
> (III)   A forward pistol grip;
> (IV)    A flash suppressor; or
> (V)     A grenade launcher or flare launcher . . . .[20]

A semiautomatic pistol with a detachable magazine[21] and a semiautomatic shotgun[22] that include similar features are also

---

[18] In other words, a person cannot shield an assault weapon from violating the act by simply breaking it down into parts that can be put back together rapidly. See Conn. Gen. Stat. § 53-202a(a)(1)(ii).

[19] See Conn. Gen. Stat. § 53-202a(1)(E). The one-feature test is a change from the 1993 Act which employed a two-feature test whereby it prohibited firearms that had at least two listed features.

[20] Conn. Gen. Stat. § 53-202a(1)(E)(i)(I)-(V).

[21] This type of pistol qualifies as an assault weapon if it has any of the following features: "(I) an ability to accept a detachable ammunition magazine that attaches at some location outside of the pistol grip; (II) A threaded barrel capable of accepting a flash suppressor, forward pistol grip

considered assault weapons.[23] Finally, a semiautomatic, centerfire rifle that has a fixed magazine with the ability to accept more than ten rounds or that has an overall length of less than thirty inches, as well as a shotgun with the ability to accept a detachable magazine or a revolving cylinder are prohibited as assault weapons.[24]

### Large Capacity Magazines

The June amendment[25] also prohibits, with certain exceptions, "large capacity magazines" (hereinafter "LCMs"). The legislation defines LCMs to be "any firearm magazine, belt, drum, feed strip or similar device that has the capacity of, or can be readily restored or converted to accept, more than ten rounds of ammunition, but does not include: (A) A feeding device that has been permanently altered so that it cannot accommodate more than ten rounds of ammunition, (B) a .22 caliber tube ammunition feeding device, (C) a tubular magazine that is

---

or silencer; (III) A shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to fire the firearm without being burned, except a slide that encloses the barrel; or (IV) A second hand grip." Conn. Gen. Stat. § 53-202a(E)(iv)(I)-(IV).

[22] This type of shotgun qualifies as an assault weapon if it has both "i) a folding or telescoping stock and ii) any grip of the weapon, including a pistol grip, a thumbhole stock, or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing." Conn. Gen. Stat. § 53-202a(1)(C)(i)-(ii).

[23] See Conn. Gen. Stat. § 53-202a(1)(E)(ii)-(viii).

[24] See Conn. Gen. Stat. § 53-202a(1)(E)(ii),(iii),(vii) and (viii).

[25] Conn. P.A. 13-220.

contained in a lever-action firearm, or (D) a magazine that is permanently inoperable."[26]

## Exceptions

The legislation, however, is not an outright ban with respect to the enumerated firearms because many of its provisions contain numerous exceptions. For example, a person is exempt if they "lawfully possesse[d] an assault weapon" before April 4, 2013, the effective date of the legislation, and "appl[ied] by January 1, 2014 to the Department of Emergency Services and Public Protection for a certificate of possession with respect to such assault weapon."[27] In addition, LCMs may be possessed, purchased, or imported by "[m]embers or employees of the Department of Emergency Services and Public Protection, police departments, the Department of Correction, the Division of Criminal Justice, the Department of Motor Vehicles, the Department of Energy and Environmental Protection or the military or naval forces of this state or of the United States

---

[26] See Conn. P.A. 13-220, § 1(a)(1). By way of clarification, the court notes that Connecticut has yet to codify this section of the law. The plaintiffs make numerous references in their briefing to "Conn. Gen. Stat. 53-202p" and its various subsections.  Presumably the plaintiffs are citing the law using LexisNexis's internal citation, which provides the text as "P.A. 13-220, s. 1, at CGS 53-202p." At the bottom of the page, in the Editor's Notes, Lexis states: "[t]he placement of this section is not final" and "this section should be referenced by its Public Act citation, found in the legislative history following the statute text."  The court will refer to this section by its Public Act citation.

[27] See Conn. Gen. Stat. § 53-202D(a)(2).

for use in the discharge of their official duties or when off duty."[28] Finally, the legislation allows exempt personnel "who retire[] or [are] otherwise separated from service" an extension of time to declare lawfully possessed assault weapons and LCMs used in the discharge of their duties.[29] Any person who is not exempted and "possesses an assault weapon . . . shall be guilty of a class D felony . . . ."[30]

On May 22, 2013, in response to the legislation, the plaintiffs filed the complaint in this action.

<u>**STANDARD**</u>

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an

---

[28] Conn. P.A. 13-220 § 1(d)(1).

[29] <u>See</u> <u>e.g.</u> Conn. P.A. 13-220 §§ 2(a)(2) and 7(a)(2).

[30] <u>See</u> Conn. Gen. Stat. § 53-202c(a). The legislation also provides that "[a]ny person who, within [Connecticut], distributes, transports or imports into the state, keeps for sale, or offers or exposes for sale, or who gives any assault weapon, except as provided by sections 52-202a to 53-202k, inclusive, shall be guilty of a class C felony and shall be sentenced to a term of imprisonment of which two years may not be suspended or reduced by the court." Conn. Gen. Stat. § 53-202b(a)(1).

essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" Am. Int'l Group, Inc. v. London Am. Int'l Corp., 644 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce and Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975)).

A dispute concerning a material fact is genuine "if evidence is such that a reasonable jury could return a verdict for the nonmoving party." Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  The court must view all inferences and ambiguities in a light most favorable to the nonmoving party.  See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991), cert. denied, 502 U.S. 849 (1991).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Maffucci, 923 F.2d at 982.

## DISCUSSION

### I.   Second Amendment Challenge

The plaintiffs first argue that assault weapons and LCMs are commonly possessed for self-defense in the home. Specifically, the plaintiffs argue that "[t]he firearms and magazines that Connecticut bans are lawfully manufactured (many

10

in Connecticut itself) and are lawfully purchased by millions of
Americans after passing" national and state-required background
checks. The plaintiffs argue that the banned firearms and
magazines "are in common use by . . .  millions of law-abiding
citizens for self-defense, sport, and hunting." The plaintiffs
state that the new restrictions are not the national norm[31] and
are "anything but long-standing."

The defendants respond that the plaintiffs' "absolutist
interpretation" of the Second Amendment conflicts with the
established framework of cases decided by the U.S. Supreme Court
and the U.S. Court of Appeals for the Second Circuit.
Specifically, the defendants argue that the assault weapons and
magazines at issue in this case are outside this established
framework.[32] The defendants argue that "the Act only marginally
impacts Plaintiffs' ability to obtain firearms and magazines for
lawful home and self defense." The defendants argue that
"Connecticut's regulatory scheme provides ample avenues through

---

[31] The plaintiffs state that "the laws of most states and federal law have no
restrictions on magazine capacity or the number of rounds that may be loaded
in a magazine, nor do they restrict guns that some choose to call 'assault
weapons.'"

[32] The defendants state that 1)"[t]he Act is a reasonable and logical
extension of a twenty-year old Connecticut statute that mirrors analogous
laws that have existed for decades in other jurisdictions," and thus a
longstanding restriction on the possession of certain firearms; 2)"the Act
does not prohibit an entire class of firearms, like all conventional handguns
that are the 'quintessential self-defense weapon' . . . [n]or does it even
ban all semiautomatic firearms;" and 3)the act "bans a tiny subset of
unusually dangerous military-style weapons and magazines that 'are designed
to enhance their capacity to shoot multiple human targets very rapidly."

which citizens may purchase and obtain permits to carry the thousands of lawful firearms and magazines that are available to them, including four different permit options that most law-abiding citizens should have no difficulty obtaining."

Recent Second Amendment jurisprudence within the second circuit has produced a two-part approach for determining the constitutionality of gun related legislation. Kachalsky v. Cnty. of Westchester, 701 F.3d 81, 88 (2d Cir. 2012) cert. denied, 133 S. Ct. 1806 (U.S. 2013); U.S. v. Decastro, 682 F.3d 160, 166 (2d Cir. 2012) cert. denied, 133 S. Ct. 838 (U.S. 2013).[33]

First, the court determines if the provision in question impinges upon a Second Amendment right. That is, whether the regulated firearms or magazines are commonly used for lawful purposes and, if they are, whether the legislation substantially burdens a Second Amendment right. If so, the court's second step is to determine and apply the appropriate level of scrutiny.[34] See Heller v. D.C., 670 F.3d 1244, 1261 (D.C. Cir. 2011)("Heller II") (finding that the court must "ask first whether a particular provision impinges upon a right protected by the Second Amendment; if it does, then we go on to determine whether

---

[33] Other circuits have taken a similar approach to the Second Amendment. See e.g., Heller v. D.C., 670 F.3d 1244, 1261 (D.C. Cir. 2011)("Heller II"); Ezell v. City of Chicago, 651 F.3d 684, 701-04 (7th Cir. 2011); U.S. v. Chester, 628 F.3d 673, 680 (4th Cir. 2010); U.S. v. Reese, 627 F.3d 792, 800-01 (10th Cir. 2010); U.S. v. Marzzarella, 614 F.3d 85, 89 (3d Cir. 2010).

[34] See Infra Part I.A., discussing constitutional levels of scrutiny.

the provision passes muster under the appropriate level of constitutional scrutiny").

Second Amendment jurisprudence is currently evolving, and the case law is sparse. See District of Columbia v. Heller, 554 U.S. 570, 636 (2008)(noting that Heller "represents the [Supreme] Court's first in-depth examination of the Second Amendment, [and] one should not expect it to clarify the entire field . . ."). Id.[35] The second circuit thereafter recognized that Heller "raises more questions than it answers." Kachalsky v. Cnty. of Westchester, 701 F.3d 81, 88 (2d Cir. 2012).[36]

What the Heller court did make clear, however, is that weapons that are "in common use at the time" are protected under the Second Amendment. Heller, 554 U.S. at 627.[37] The court explained that the determination is "fairly supported by the historical tradition of prohibiting the carrying of dangerous

---

[35] Heller struck down as violative of the Second Amendment, a D.C. statute that banned hand gun possession in one's home, as well as a "prohibition against rendering any lawful firearm in the home operable for the immediate purpose of self-defense". Id. In a subsequent case, the Supreme Court held that the right to keep and bear arms is "fully applicable to the States" through the Fourteenth Amendment. McDonald v. City of Chicago, 130 S. Ct. 3020, 3026 (2010).

[36] Heller "declined to announce the precise standard of review applicable to laws that infringe the Second Amendment right because the laws at issue . . . would be unconstitutional '[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights.'" Decastro, 682 F.3d at 165 (quoting Heller 554 U.S. at 628-629).

[37] The Heller court did not, however, identify what "time" it meant when it used the phrase "in common use at the time." New York State Rifle & Pistol Ass'n, Inc. v. Cuomo, 2013 WL 6909955 at *9 (W.D.N.Y. Dec. 31, 2013) (hereinafter "NYSRPA").

and unusual weapons." <u>Heller</u>, 554 U.S. at 627 (citing <u>U.S. v.</u> <u>Miller</u>, 307 U.S. 174, 179 (1939)).[38] Whether legislation substantially burdens a Second Amendment right is heavily dependent on the firearms in question being in "common use."

Heller also concluded that regulations rendering firearms in the home inoperable at all times "makes it impossible for citizens to use them for the <u>core lawful purpose</u> of self-defense and is hence unconstitutional." <u>Id.</u> at 630 (emphasis added).

In <u>Heller II</u>, a case determining the constitutionality of a District of Columbia amendment "promulgated in effort to cure constitutional deficits that the Supreme Court had identified in *Heller*," the U.S. Court of Appeals for the District of Columbia Circuit thought "it clear enough in the record that semi-automatic rifles and magazines holding more than ten rounds are indeed in 'common use.'" <u>Heller II</u>, 670 F.3d 1244, 1261 (D.C. Cir. 2011).[39] However, the court could not "be certain whether

---

[38] Furthermore, the Supreme Court emphasized that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." <u>Heller</u>, 554 U.S. at 626-27. The Supreme Court also stated that "[l]ike most rights, the Second Amendment right is not unlimited." <u>Id.</u> at 570. Thus, the Supreme Court logically concluded that "[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment." <u>McDonald</u>, 130 S. Ct. at 3047; <u>see</u> <u>also</u> <u>Kachalsky</u>, 701 F.3d at 89 (concluding that <u>McDonald</u> reaffirmed <u>Heller's</u> assurances that Second Amendment rights are far from absolute and that many longstanding handgun regulations are "presumptively lawful").

[39] Similarly, the <u>NYSRPA</u> court found that the statistics provided by the parties on the popularity and percentage of ownership of assault weapons paint very different pictures and "leave many questions unanswered." <u>NYSRPA</u>

14

these weapons are commonly used or are useful specifically for self-defense or hunting and therefore whether the prohibitions of certain semi-automatic rifles and magazines holding more than ten rounds meaningfully affect the right to keep and bear arms." Heller II, 670 F.3d at 1261.

The Connecticut legislation here bans firearms in common use. Millions of Americans possess the firearms banned by this act for hunting and target shooting. See Heller II, 670 F.3d 1244, 1261[40] (finding "[a]pproximately 1.6 million AR-15s alone have been manufactured since 1986, and in 2007 this one popular model accounted for 5.5 percent of all firearms, and 14.4 percent of all rifles, produced in the U.S. for the domestic market").[41]

Additionally, millions of Americans commonly possess firearms that have magazines which hold more than ten

---

WL 6909955 at *10.  Since Heller did not elaborate on what time it meant "when it held that protected weapons are those that are 'in common use at the time', . . . it is anomalous that a weapon could be unprotected under the Second Amendment one moment, then, subject only to the whims of the public, garner protection in the next moment." Id.  Even so, a firearm must also be possessed for lawful purposes, and the NYSRPA court found "[o]n this point, too, the parties [were] deeply divided." Id. at 11.

[41]  The AR-15 type rifle, which is an assault weapon under the legislation, is the leading type of firearm used in national matches and in other matches sponsored by the congressionally established Civilian Marksmanship Program. Plaintiffs' SOF, ¶¶ 123-124.  In 2011, AR-15s accounted for at least 7% of all firearms and 18% of all rifles made in the U.S. for the domestic market that year. See Declaration of Mark Overstreet at 2-4 ("Overstreet Decl.").  Additionally, "the banned features are commonly found (either individually or in combination) on AR-15 type modern sporting rifles." See Declaration of Paul Hiller at 3.

cartridges.[42] See Heller II, 670 F.3d at 1261 (finding that
"fully 18 percent of all firearms owned by civilians in 1994
were equipped with magazines holding more than ten rounds, and
approximately 4.7 million more [of] such magazines were imported
into the United States between 1995 and 2000)."[43]

The court concludes that the firearms and magazines at
issue are "in common use" within the meaning of Heller and,
presumably, used for lawful purposes. The legislation here bans
the purchase, sale, and possession of assault weapons and LCMs,
subject to certain exceptions, which the court concludes more
than minimally affect the plaintiffs' ability to acquire and use
the firearms, and therefore levies a substantial burden on the
plaintiffs' Second Amendment rights. Accordingly, the court must
proceed to the next step of the analysis and determine which
level of scrutiny applies.

A. **Levels of Scrutiny**

Cases that involve challenges to the constitutionality of
statutes often discuss what have become known as "levels of

---

[42] Numerous rifle designs utilize magazines with a capacity of more than ten
cartridges including the M1 Carbine, AR-15, and Ruger Mini-14 series, and, in
recent decades, the trend in semiautomatic pistols has been to those designed
to hold ten rounds or more. See Mark Overstreet Decl. at 5-6

[43] Heller II went on to conclude that "[t]here may well be some capacity above
which magazines are not in common use but, if so, the record is devoid of
evidence as to what that capacity is; in any event, that capacity surely is
not ten." Heller II, 670 F.3d at 1261.

scrutiny." The "traditionally expressed levels" are strict scrutiny, intermediate scrutiny, and rational basis review. <u>D.C. v. Heller</u>, 554 U.S. 570, 634 (2008). Levels of scrutiny have developed because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them" and are not subject to the whims of future legislatures or judges. <u>Id.</u> at 634-35. By applying the proper level of scrutiny to challenged legislation, courts are more likely to apply a uniform analysis to their review of such legislation.

"[A] government practice or statute which restricts 'fundamental rights' or which contains 'suspect classifications' is to be subjected to 'strict scrutiny' and can be justified only if it furthers a compelling government purpose and, even then, only if no less restrictive alternative is available." <u>Regents of University of California v. Bakke</u>, 438 U.S. 265, 357 (1978); <u>see also</u> <u>Abrams v. Johnson</u>, 521 U.S. 74, 82 (1997) (noting that, under strict scrutiny, the challenged regulation must be "narrowly tailored to achieve a compelling government interest").

In order to survive intermediate scrutiny, a law must be "substantially related to an important governmental objective." <u>Clark v. Jeter</u>, 486 U.S. 456, 461 (1998). Historically, intermediate scrutiny has been applied to content-neutral restrictions that place an incidental burden on speech,

disabilities attendant to illegitimacy, and discrimination on the basis of sex. U.S. v. Virginia, 518 U.S. 515, 568. (1996).

Under rational basis review, a statute will be upheld "so long as it bears a rational relation to some legitimate end." Romer v. Evans, 517 U.S. 620, 631 (1996); Vacco v. Quill, 521 U.S. 793, 799 (1997). Rational basis is typically applied "[i]n areas of social and economic policy" when a statutory classification "neither proceeds along suspect lines nor infringes fundamental constitutional rights." F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 313. (1993).

B. **The Appropriate Level of Scrutiny**

The plaintiffs argue that the legislation "implicates the possession of firearms inside the home, where [the second circuit] recognizes that Second Amendment rights are at their zenith." Specifically, the plaintiffs argue that "a higher standard than intermediate scrutiny applies to prohibitions on possession of firearms and magazines in the home." The plaintiffs argue that "like the handgun ban in *Heller*, the ban on common firearms and magazines here is categorically void under the Second Amendment. Alternatively, and at a minimum, since the Act prohibits [the] exercise of a fundamental right in the home, it must be evaluated by the highest levels of

scrutiny." Regardless, the plaintiffs argue, the legislation would neither pass intermediate scrutiny nor strict scrutiny.

The defendants respond that "[a]lthough the protections of the Second Amendment may be at their apex in the home, neither Heller, McDonald, Kachalsky, nor any other case establishes a bright line rule for which Plaintiffs advocate."

The Heller majority suggested that laws implicating the Second Amendment should be reviewed under one of the two traditionally expressed levels[44] of heightened scrutiny: intermediate scrutiny or strict scrutiny.

Two recent second circuit decisions, Kachalsky v. Cnty. of Westchester, 701 F.3d 81 (2d Cir. 2012) and U.S. v. Decastro, 682 F.3d 160 (2d Cir. 2012), have addressed the issue of determining the applicable standard to gun restrictions under the Second Amendment. The second circuit concluded that "[h]eightened scrutiny is triggered only by those restrictions that operate as a substantial burden on the ability of law-abiding citizens to possess and use a firearm for self-defense (or for other lawful purposes)." Decastro, 682 F.3d at 166; see also Kachalsky, 701 F.3d at 93 (finding that with the "core"

---

[44] "If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect." Heller, 554 U.S. at 628 n.27.

protection of self-defense in the home, "some form of heightened scrutiny [is] appropriate").

Unlike the law struck down in <u>Heller</u>, the legislation here does not amount to a complete prohibition on firearms for self-defense in the home. Indeed, the legislation does not prohibit possession of the weapon cited as the "quintessential self-defense weapon" in <u>Heller</u>, i.e., the handgun. In other words, "the prohibition of [assault weapons] and large-capacity magazines does not effectively disarm individuals or substantially affect their ability to defend themselves." <u>Heller II</u>, 670 F.3d at 1262. The challenged legislation provides alternate access to similar firearms and does not categorically ban a universally recognized[45] class of firearms.[46]

Here, as in <u>Heller II</u>, the court is "reasonably certain the prohibitions do not impose a substantial burden" upon the <u>core right</u>[47] protected by the Second Amendment. <u>Heller II</u>, 670 F.3d at 1262. Thus, the court concludes that intermediate scrutiny is the appropriate standard in this case. [48]

---

[45] See *supra*, note 12.

[46] <u>See e.g.</u>, <u>New York State Rifle & Pistol Ass'n, Inc. v. Cuomo</u>, WL 6909955 at *13 (W.D.N.Y. Dec. 31, 2013) (finding New York's Gun Act "applies only to a subset of firearms with characteristics New York State has determined to be particularly dangerous and unnecessary for self-defense").

[47] See *supra* p. 14.

[48] Several factors support this conclusion, which were identified in <u>NYSRPA</u>: "First, although addressing varied and divergent laws, courts throughout the country have nearly universally applied some form of intermediate scrutiny in

C. __Intermediate Scrutiny Applied__

The plaintiffs argue that the legislation "comes nowhere near" being substantially related to the achievement of an important governmental objective. Specifically, the plaintiffs argue that the "repetitive use of the word 'assault weapon' fails to address how banning any defined feature would reduce crime in any manner." The plaintiffs, citing United States v. Chester, 628 F.3d 673, 683 (4th Cir. 2010), argue that "[t]he government must do more than offer 'plausible reasons why' a gun restriction is substantially related to an important government goal." According to the plaintiffs, the defendants "must also 'offer sufficient evidence to establish a substantial relationship between' the restriction and that goal to determine whether the restriction 'violated the Second Amendment by application of the intermediate scrutiny test.'"

The defendants respond that "the government has a compelling interest in protecting public health and safety by eliminating assault weapons and LCMs from the public sphere." Specifically, the defendants argue that "[t]he evidence

---

the Second Amendment context . . . Second, application of strict scrutiny would appear to be inconsistent with the Supreme Court's holdings in *Heller* and *McDonald,* where the Court recognized several 'presumptively lawful regulatory measures' . . . [and third,] First Amendment jurisprudence provides a useful guidepost in this arena" (because free speech is "susceptible to several standards of scrutiny, depending on the type of law challenged and the type of speech at issue"). NYSRPA, 2013 WL 6909955 at *12.

demonstrates that the Act is substantially related to that goal because it will: (1) reduce the number of crimes in which these uniquely dangerous and lethal weapons are used; and (2) thereby reduce the lethality and injuriousness of gun crime when it does occur." The defendants argue that the plaintiffs "completely ignore all of the evidence and justifications discussed above, and again rely almost exclusively on their own self-serving and unsupported submissions, self-interested policy positions, and preferred views as to the wisdom of Connecticut's bans and the utility of these weapons and magazines."

Under intermediate scrutiny, "a regulation that burdens a plaintiff's Second Amendment rights 'passes constitutional muster if it is substantially related to the achievement of an important governmental interest.'" Kwong v. Bloomberg, 723 F.3d 160, 168 (2d Cir. 2013)(citing Kachalsky v. Cnty. of Westchester, 701 F.3d 81, 96 (2d Cir. 2012)).

As the second circuit has noted, "[s]ubstantial deference to the predictive judgments of [the legislature] is warranted . . . [and] [t]he Supreme Court has long granted deference to legislative findings that are beyond the competence of courts." Kachalsky, 701 F.3d at 96 (2d Cir. 2012) (citing Holder v. Humanitarian Law Project, 130 S. Ct. 2705, 2727 (2010)).[49]

---

[49] The Kachalsky court elaborated and stated that "[s]tate regulation under the Second Amendment has always been more robust than of other enumerated

Govermental separation of powers requires the court to declare legislative acts unconstitutional only if "the lack of constitutional authority to pass [the] act in question is clearly demonstrated." <u>Kachalsky</u>, 701 F.3d at 101 (2d Cir. 2012)(citing <u>United States v. Harris</u>, 106 U.S. 629, 635 (1883)). "The regulation of firearms is a paramount issue of public safety, and recent events in this circuit are a sad reminder that firearms are dangerous in the wrong hands." <u>Osterweil v. Bartlett</u>, 706 F.3d 139, 143 (2d Cir. 2013). The legislature is "far better equipped than the judiciary" to make delicate political decisions and policy choices "concerning the dangers in carrying firearms and the manner to combat those risks." <u>Kachalsky</u>, 701 F.3d at 85 (citing <u>Turner Broad. Sys., Inc. v. FCC</u>, 512 U.S. 622, 665 (1994)).

Accordingly, the court must only "assure that, in formulating its judgments,[Connecticut] has drawn reasonable inferences based on substantial evidence." <u>Id.</u> at 38 (citing <u>Turner Broad. Sys., Inc. v. FCC</u>, 512 U.S. 622, 665 (1994)). However, to survive intermediate scrutiny, "the fit between the challenged regulation and the asserted objective [need only] be reasonable, not perfect." <u>United States v. Marzzarella</u>, 614 F.3d 85, 98 (3d Cir. 2010).

---

rights," and there is a "general reticence to invalidate the acts of our elected leaders." <u>Kachalsky</u>, 701 F.3d at 100.

Connecticut's General Assembly made its legislative judgment concerning assault weapon and LCM possession after the mass-shooting at Sandy Hook Elementary School. The decision to prohibit their possession was premised on the belief that it would have an appreciable impact on public safety and crime prevention.[50]

The evidence suggests that there is a substantial governmental interest in restricting both assault weapons and LCMs.[51] "Far from being simply 'cosmetic,' [pistol grips, barrel shrouds, and LCMs] . . . all contribute to the unique function of any assault weapon to deliver extraordinary firepower." Heller II, 670 F.3d at 1264;[52] see also Testimony of Brian J. Siebel at 2. The assault weapon features increase a firearm's "lethalness" and are therefore related to a compelling interest

---

[50] As evidenced in the legislative record: "At the end of that unimaginable day, we learned that we had lost 20 elementary school children and 6 teachers and administrators. They were killed with a weapon of war, a semi-automatic assault rifle, the platform of which – was originally designed for the battlefield and mass killings. . . ." The legislature recognized that "access to guns is a big part of the public health challenges in our country today." See Connecticut Senate Session Transcript for April 3, 2013.

[51] Christopher S. Koper, states that it is his "considered opinion, based on [his] nineteen years as a criminologist studying firearms generally and [his] detailed study of the federal assault weapon ban in particular, that Connecticut's bans on assault weapons and large-capacity magazines, and particularly its ban on LCMs, have the potential to prevent and limit shootings in the state over the long-run." Koper Aff. at 17.

[52] Finding that "[a]lthough semi-automatic firearms, unlike automatic M-16s, fire only one shot with each pull of the trigger, semi-automatics still fire almost as rapidly as automatics. . . ." Heller II, 670 F.3d at 1264 (internal quotation marks and citations omitted).

of crime control and public safety.[53] For example, with respect

to LCMs, the evidence suggests that limiting the number of

rounds in a magazine promotes and is substantially related to

the important governmental interest in crime control and

safety.[54] Heller II, 670 F.3d at 1264 (finding "that large-

capacity magazines tend to pose a danger to innocent people and

particularly to police officers . . . .").

        The court concludes that Connecticut has a substantial

governmental interest in public safety and crime prevention.[55]

This conclusion is not unique to Connecticut, and courts in

---

[53] New York State Rifle & Pistol Ass'n, Inc. v. Cuomo, 2013 WL 6909955 at *15
(finding that, although the merits of the judgment remain to be seen,
substantial evidence supports the finding that the "banned features are
usually dangerous, commonly associated with military combat situations, and
are commonly found on weapons used in mass shootings" and that "military
features of semiautomatic assault weapons are designed to enhance the
capacity to shoot multiple human targets rapidly").

[54] This is because limiting rounds in a magazine means that a shooter has to
pause periodically to change out his magazine, reducing the amount of rounds
fired and limiting the shooters capability of laying "suppressing fire" that
can frustrate the efforts of responding law enforcement. See Mello Aff. at
¶¶18,30; Sweeney Aff. at ¶¶15, 20; NYSRPA 2013 WL 6909955 at *17 (finding the
link between the ban on large capacity magazines and the state's interest in
public safety is strong due to evidence suggesting that banning LCMs "will
prevent shootings and save lives").

[55] Other courts have also found that the states have "substantial, indeed
compelling, governmental interests" in public safety and crime prevention.
Schenck v. Pro-Choice Network, 519 U.S. 357, 376 (1997); Schall v. Martin,
467 U.S. 253, 264 (1984); Hodel v. Va. Surface Mining & Reclamation Ass'n,
452 U.S. 264, 300, (1981); Bloomberg, 723 F.3d 160, 168 (2d Cir. 2013); Kwong
v. Woollard v. Gallagher, 712 F.3d 865, 877 (4th Cir. 2013) cert. denied, 134
S. Ct. 422 (U.S. 2013); Kachalsky v. County of Westchester 701 F.3d at 97 (2d
Cir. 2012); Heller II, 670 F.3d at 1264; Kuck v. Danaher, 600 F.3d 159, 166
(2d Cir.2010); NYSRPA 2013 WL 6909955 at *15.

other states have recognized the constitutionality of similar gun control legislation.[56]

Connecticut has carried its burden of showing a substantial relationship between the ban of certain semiautomatic firearms and LCMs and the important governmental "objectives of protecting police officers and controlling crime." Heller II, 670 F.3d at 1264. The relationship need not fit perfectly. Obviously, the court cannot foretell how successful the legislation will be in preventing crime. Nevertheless, for the purposes of the court's inquiry here, Connecticut, in passing the legislation, has drawn reasonable inferences from substantial evidence. As such, the legislation survives intermediate scrutiny and is not unconstitutional with respect to the Second Amendment.

## II.  **Equal Protection Cause of Action**

The plaintiffs next challenge the legislation as a violation of the Equal Protection Clause of the Fourteenth Amendment because it prohibits the general population from possessing assault weapons and LCMs but creates an exception for certain state, local, or military personnel (hereinafter "exempt personnel"). Specifically, the plaintiffs cite Conn. P.A. 13-220, § 1(d)(1), which they state allows exempt personnel to "have all the magazines and 'assault weapons' they want, even for

---

[56] See D.C. Code §§ 7-2502.02 and 7-2506.01; N.Y. Penal Law § 265.00.

personal use 'when off duty.'"[57] The plaintiffs argue that "[t]he
unconstitutional provisions here discriminating in favor of
selected classes may not simply be excised from the Act, because
the Act does not make it a crime for the favored classes to
possess the subject firearms and magazines."

The defendants respond that the plaintiffs have not
satisfied their burden of presenting evidence comparing
themselves to individuals that are "similarly situated in all
material aspects" and that "[c]ommon sense dictates that they
cannot plausibly do so."  Specifically, the defendants argue
that differences between the general public and members of law
enforcement (and the military) are "obvious and even
pronounced," because these officers receive professional
training and are called on "to actively engage and apprehend
dangerous criminals." The defendants argue that these
differences apply even after work hours because law enforcement
officers are "never truly 'off-duty,' and have a professional
obligation to respond to emergencies or criminal activity
whenever and wherever they arise."[58]

---

[57] Conn. P.A. 13-220, § 1(d)(1).
[58] The defendants also state that "members of the military are not similarly
situated to the general public because they are governed by applicable
federal and military laws, which the State appropriately chose not to
contravene or even encroach upon." With respect to military personnel, the
plaintiffs state that "the exemption could have been limited to duty
purposes" and being compelled to perform law enforcement functions "does not
apply to military members and other exempted persons who have no such
duties."

27

The plaintiffs reply that "[w]hile an off-duty exemption may be warranted for officers who may be 'compelled to perform law enforcement functions in various circumstances,' *Silveira v. Lockyer*, 312 F.3d 1052, 1089 (9th Cir. 2002), that does not apply to military members and the other exempted persons who have no such duties."

The provisions at issue in the legislation impose felony penalties on most citizens for the possession and transfer of the subject firearms and magazines. However, exempt personnel may possess assault weapons and LCMs "for use in the discharge of their official duties or when off duty."[59]  The legislation allows exempt personnel "who retire[] or [are] otherwise separated from service" an extension of time to declare lawfully possessed assault weapons and LCMs used in the discharge of their duties.[60]

The Equal Protection Clause of the Fourteenth Amendment commands that no state shall "deny to any person within its jurisdiction, the equal protection of the laws." Plyler v. Doe, 457 U.S. 202, 210 (1982). However, as the Supreme Court has explained, the equal protection clause does not forbid

---

[59] See Conn. P.A. 13-220 § 1(d)(1); Conn. Gen. Stat. § 53-202c(b)(2). Several provisions do not read exactly this way, but are nearly the same. For example, part of one provision reads: ". . . for use by such sworn member, inspector, officer or constable in the discharge of such sworn member's, inspector's, officer's or constable's official duties or when off duty." Conn. P.A. 13-3, § 23(d)(2).

[60] See e.g. Conn. P.A. 13-220 §§ 2(a)(2) and 7(a)(2).

classifications. <u>Nordlinger v. Hahn</u>, 505 U.S. 1, 10, (1992)
(noting that "most laws differentiate in some fashion between
classes of persons"). "It simply keeps governmental
decisionmakers from treating differently persons <u>who are in all</u>
<u>relevant respects alike</u>." <u>Id</u>.; <u>see</u> <u>also</u> <u>Silveira v. Lockyer</u>, 312
F.3d 1052, 1088 (9th Cir. 2002) (finding that "[f]irst, in order
for a state action to trigger equal protection review at all,
that action must treat similarly situated persons disparately");
<u>City of Cleburne, Tex. V. Cleburne Living Center</u>, 473 U.S. 432,
439 (1985) (emphasis added).

Some courts have concluded that a Second Amendment
analysis, as conducted here in section I, is sufficient to
assess the alleged burdening of Second Amendment rights and have
declined to conduct a separate equal protection analysis.[61] Many
courts subjected the equal protection challenge to rational
basis review.[62] <u>Kwong v. Bloomberg</u>, 723 F.3d 160, 164 (2d Cir.
2013) (finding a "geographic classification was not suspect, the
statute itself did not burden a fundamental right, and the

---

[61] <u>See</u> <u>Wollard v. Gallagher</u>, 712 F.3d 865, 873 n.4 (4th Cir. 2013) (declining
to conduct a separate equal protection analysis for Maryland's "good-and-
substantial-reason requirement" for obtaining a handgun permit, because the
equal protection claim was "essentially a restatement of [the] Second
Amendment claim").

[62] In applying constitutional scrutiny to a legislative classification or
distinction, if it "neither burdens a fundamental right nor targets a suspect
class, we will uphold [the classification or distinction] so long as it bears
a rational relation to some legitimate end." <u>Romer v. Evans</u>, 517 U.S. 620,
631 (1996); <u>see</u> <u>also</u> <u>Vacco v. Quill</u>, 521 U.S. 793, 799 (1997).

legislative classification bore a rational relation to legitimate interest").[63]  In Silveira v. Lockyer, the court recognized the "similarly situated" requirement in an equal protection cause of action when analyzing a similar off-duty officer provision, but ostensibly omitted it in its analysis because the provision was "easily resolved" under rational basis review. Silveira, 312 F.3d at 1089 (9th Cir. 2002).[64]

Notwithstanding, the plaintiffs have not met the threshold requirement of demonstrating that they are similarly situated to the exempted personnel in the legislation.

The court concludes that law enforcement, unlike the general public, often confront organized groups of criminals with the most dangerous weaponry. Furthermore, the differences between the general public and law enforcement are similar to the differences between the public and members of the military, if not even more pronounced.

---

[63] See also Coal. of New Jersey Sportsmen, Inc. v. Whitman, 44 F. Supp.2d 666, 685 (D.N.J. 1999) aff'd, 263 F.3d 157 (3d Cir. 2001) (applying rational basis review with respect to an equal protection cause of action in a case concerning an assault weapons ban); National Rifle Ass'n of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives, 700 F.3d 185, 211-12 (5th Cir. 2012) (applying rational basis review to a firearm regulation because it did not "impermissibly interfere with the exercise of a fundamental right").

[64] The Silveria court concluded that "[i]t is manifestly rational for at least most categories of peace officers to possess and use firearms more potent than those available to the rest of the populace in order to maintain public safety." Silveira, 312 F.3d at 1089.

The charge of protecting the public, and the training that accompanies that charge, is what differentiates the exempted personnel from the rest of the population. Hence, the court agrees with the defendants that law enforcement should not be expected to apprehend criminals without superior or comparable firepower, but should only be accorded this advantage when "compelled to perform law enforcement functions." Silveira, 312 F.3d at 1089.   Similarly, members of the military and government agency personnel who use the otherwise banned firearms and magazines in the course of their employment should also have an advantage while maintaining public safety even if not technically "on the clock."

While not perfectly crafted, the court concludes that the challenged provisions only allow for the use of assault weapons and LCMs for law enforcement or for similar public safety purposes. The court reads the provisions in question to mean that exempted personnel may use assault weapons and LCMs for use in the discharge of their official duties whether on or off duty.[65] In addition, the extension of time to declare the assault

---

[65] In fact, § 6(b)(1) of P.A. 13-3 states that "nor shall any provision in sections 53-202a to 53-202k, inclusive, as amended by this act, prohibit the possession or use of assault weapons by sworn members of these agencies when on duty and when the possession or use is within the scope of such member's duties." Conn. P.A. 13-220, § 6(b)(1). It would be absurd to require the use of an assault weapon to be within the scope of the member's duties when "on duty" but allow for recreational use by members of these agencies while "off duty." Likewise, another provision does not require exempt personnel to declare possession with "respect to a large capacity magazine used for official duties." P.A. 13-3 § 2(a)(2).

weapons and LCMs is consistent with other provisions that allowed non-exempt personnel to declare their LCMs and firearms that were lawfully possessed before the legislation came into effect.[66]

The court concludes that the plaintiffs have failed to prove the threshold requirement that the statute treats differently persons who are in all relevant aspects alike. Thus, these provisions do not violate the Equal Protection Clause of the Fourteenth Amendment.

## III. Void-for-Vagueness Cause of Action

Finally, the plaintiffs argue that portions of the legislation are unconstitutionally vague. Specifically, the plaintiffs argue that the gun and magazine bans here "impose severe criminal penalties but include no scienter elements." The plaintiffs argue that they are "entitled to challenge it both facially and as applied."

The defendants respond that "[a] statute is not unconstitutionally vague simply because some of its terms require interpretation, or because it requires citizens to take steps to ensure their compliance with it." Specifically, the

---

[66] See e.g. Conn. P.A. 13-220 §§ 2(a)(2) and 7(a)(2); see also P.A. 13-3 § 24(a).

defendants argue that the plaintiffs cannot meet their burden of showing "the Act has no 'core' at all." The defendants further argue that the "the Act is comprehensible, and clearly covers a substantial amount of core conduct." The defendants state that "there is a wide array of readily available information that gun owners can use to determine, factually, whether their weapons and magazines fall within the Act's proscriptions."

The notion that a statute is void for vagueness is a concept derived from the notice requirement of the due process clause. Cunney v. Bd. of Trustees of Vill. of Grand View, N.Y., 660 F.3d 612, 620 (2d Cir. 2011). It is a basic principle of due process that a statute is unconstitutionally vague if its prohibitions are not clearly defined. Id.; Arriaga v. Mukasey, 521 F.3d 219, 222 (2d Cir. 2008); Grayned v. City of Rockford, 408 U.S. 104, 108 (1972).

"[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense (1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement." Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498 (1982)(quoting Kolender v. Lawson, 461 U.S. 352, 357 (1983)).

33

"The degree of vagueness that the Constitution tolerates - as well as the relative importance of fair notice and fair enforcement - depends in part on the nature of the enactment." Village of Hoffman Estates, 455 U.S. at 498.  Specifically, vagueness in statutes with criminal penalties is tolerated less than vagueness in those with civil penalties because of the severity of the potential consequences of the imprecision. Id.[67]

All statutes, however, need not be crafted with "meticulous specificity," as language is necessarily marked by a degree of imprecision." Thibodeau v. Portuondo, 486 F.3d 61, 66 (2d Cir. 2007) (quoting Grayned, 408 U.S. at 110).

Here, the issue is whether the following five provisions survive a facial[68] challenge for vagueness: 1) the pistol grip; 2) copies or duplicates; 3) assault weapons; 4) modification, alteration, or assembly of magazines and components; and 5) magazines with the capacity to accept more than ten rounds. With

---

[67] The court recognizes that in City of Chicago v. Morales, 527 U.S. 41, 119 (1999) (Stevens, J.), a plurality of the U.S. Supreme Court set forth a "permeated with vagueness test" for criminal laws with no mens rea requirement. For these statutes, when "vagueness permeates the text of such a law, it is subject to facial attack." Morales, 527 U.S. at 119. The second circuit has not declared a preference for this so-called "permeated with vagueness" test or the "impermissibly vague in all its applications" test recognized in U.S. v. Rybicki, 354 F.3d 124, 129 (2d Cir. 2003). The court's conclusions here, however, are the same whether applying the Morales test or the "vague in all applications test."

[68] The defendants challenge the provisions discussed below on "on their face" and "as applied."  Challenges mounted "pre-enforcement," that is, before the plaintiffs have been charged with a crime under the legislation, are properly labeled as a 'facial challenge.'" Richmond Boro Gun Club, Inc. v. City of New York, 97 F.3d 681, 685 (2d Cir. 1996).

a facial challenge, the plaintiffs "must establish that <u>no set</u>
<u>of circumstances exists under which the Act would be valid</u>."
<u>United States v. Salerno</u>, 481 U.S. 739, 745 (1987) (emphasis
added); <u>see also</u> <u>Village of Hoffman Estates</u> 455 U.S. at 494-95
(1982); <u>Richmond Boro Gun Club, Inc. v. City of New York</u>, 97
F.3d 681, 684 (2d Cir. 1996).

**A. <u>Grip</u>**

The plaintiffs argue that every rifle and shotgun meets the
definition of an "assault weapon" under Conn. Gen. Stat. § 53-
202a(1)(E)(i)(II),(vi)(II). Specifically, the plaintiffs argue
that the "provision is vague because it applies or does not
apply to every rifle and shotgun depending on how it is being
held, but fails to give notice of any assumption that it is
being held in a specific manner."[69]

The defendants respond that "[c]ourts must interpret
statutes both to avoid absurd results and constitutional
infirmity." Specifically, the defendants contend that "[t]he
language at issue obviously exists to prohibit any grip that
results in any finger in addition to the trigger finger being
directly below the action of the weapon when it is held in the

---

[69] The plaintiffs argue that "[w]aterfowl shotguns are typically fired
vertically when ducks are flying over a blind. When pointed upward for
firing, all four fingers are directly below the action of the shotgun." The
plaintiffs argue, "[b]y contrast, a rifle with some types of pistol grips or
thumbhole stocks (depending on the configuration), when held at an angle
downward to fire at a deer in a valley, may be tilted sufficiently that the
non-trigger fingers are not directly below the action."

normal firing position, which is horizontal." As such, the defendants argue that the plaintiffs cannot "challenge the law as facially vague based on their ridiculous scenario."

The relevant provision of the act provides that it is unlawful to possess a firearm that has: "[a]ny grip of the weapon, including a pistol grip, a thumbhole stock, or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing." Conn. Gen. Stat. § 53-202a(1)(E)(II).

A "cardinal function" in interpreting a statute is to "ascertain and give effect to the intent of the legislature." Kuhne v. Cohen & Slamowitz, LLP, 579 F.3d 189, 193 (2d Cir. 2009) certified question accepted, 13 N.Y.3d 791 (2009) and certified question withdrawn, 14 N.Y.3d 786; (quoting Tom Rice Buick-Pontiac v. Gen. Motors Corp., 551 F.3d 149, 154 (2d Cir. 2008)).[70] "As the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation

---

[70] However, where a court finds it necessary, "general terms should be so limited in their application as not to lead to an absurd consequence." United States v. Fontaine, 697 F.3d 221, 228 (3d Cir. 2012) The court should "presume that the legislature intended exceptions to its language, which would avoid absurd results." Id. (quoting United States v. Kirby, 74 U.S. 482, 486-87 (1868))(internal quotation marks omitted).

must always be the language itself, giving effect to the plain meaning thereof." Slamowitz, LLP, 579 F.3d at 193.

The court interprets the language to prohibit a scenario in which the weapon is in the normal horizontal firing position. Therefore, the provision covers some, if not most applications.[71] Hence, the challenge fails because the provision is only plausibly vague when applied to a specific use of the weapon. See Richmond Boro Gun Club, Inc. 97 F.3d at 685 (finding "[a]lthough application of this standard might, in some cases, be ambiguous, it was sufficient to cover [other cases] and, thus, to preclude a facial vagueness challenge"). The provision is not impermissibly vague in all its applications and, as such, it is not unconstitutionally vague.

## B. "Copies or Duplicates"

The plaintiffs next argue that an ordinary person is expected to know the features of 183 named models in order to know whether a specific firearm is lawful, as well as be expected to 1) "be intimately familiar with" each of the listed models of rifles, pistols, and 1 model of shotgun, 2) "know which versions of the listed models were in production prior to

---

[71] While the vertical firing position may be "normal" for certain activities, such as duck hunting, it is not the overall normal firing position. Ideally, the legislation would have included a more descriptive statement than "when firing." The California penal code includes such a statement when it provides the phrase "[n]ormal firing position with barrel horizontal" in its chapter on "Unsafe Handguns" and related definitions. See Cal. Penal Code § 31900-31910.

the effective date of April 4, 2013," 3) know whether a gun "is a 'copy' or 'duplicate' of any one of these named models" and 4) know whether a gun "has 'the capability of any such' listed firearm." Specifically, the plaintiffs argue that "[o]rdinary people and police officers have no such knowledge of the design history of these scores of firearms."

The defendants respond that when "properly considered in the broader context of the statute as a whole, it is unlikely that any individual will ever need to know whether a firearm is a 'copy or duplicate' because all but one of the specifically enumerated weapons has the requisite military features to qualify as an assault weapon under the applicable features test." Specifically, the defendants argue that "[i]n the vast majority of circumstances, an individual need only physically examine his or her weapon and then read the statute to determine whether it is prohibited." The defendants also state that "the terms 'copy' and 'duplicate' are not vague on their face because they are readily understandable based on their commonly understood meanings." The defendants argue that the "[p]laintiffs' claim that ordinary individuals have no way of knowing the 'production date' of their firearm is simply wrong," because if the firearm does not have a serial number it was either produced before 1968 or it is unlawful to possess under federal law.

38

The relevant provisions of the legislation provide that a weapon is an assault weapon if it is "[a]ny of the following specified [semiautomatic firearms], or copies or duplicates thereof with the capability of any such [semiautomatic firearms], that were in production prior to or on April 4, 2013."[72] The statute goes on to list numerous firearm models.

In analyzing statutory text, the court "presume[s] that it speaks consistently with the commonly understood meaning of [its] term[s]." Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001) (citing Walters v. Metropolitan Ed. Enters., Inc., 519 U.S. 202, 207 (1997)). "A 'copy' is defined as 'an imitation, or reproduction of an original work.' A 'duplicate' is defined to include 'either of two things that exactly resemble or correspond to each other.'" Id. (internal citations omitted).[73]

The Supreme Court of Illinois, in Wilson v. Cnty. of Cook, concluded that "[a] person of ordinary intelligence would understand that [the section with the "copies or duplicates" language] includes the specific weapons listed and any imitations or reproductions of those weapons made by that manufacturer or another. When read together with the listed

---

[72] Conn. Gen. Stat. § 53-202a(1)(B),(C) and (D).

[73] The Kuhlman court found that the "'copies or duplicates' language was added to the Ordinance in order to prevent manufacturers from simply changing the name of the specified weapons to avoid criminal liability." Kuhlman, 261 F.3d at 311.

weapons, the provision is not vague." <u>Wilson v. Cnty. of Cook</u>,
968 N.E.2d 641, 652-53 (Ill. 2012).

In <u>New York State Rifle & Pistol Ass'n, Inc. v. Cuomo</u>, 2013
WL 6909955 (W.D.N.Y. Dec. 31, 2013), however, the court found
that a provision[74] of the New York Penal Law regulating
"semiautomatic <u>version[s]</u> of an automatic rifle, shotgun or
firearm" was "excessively vague, as an ordinary person cannot
know whether any single semiautomatic pistol is a 'version' of
an automatic one." <u>Id.</u> at *24 (emphasis added).

Here, the "copies or duplicates" language is not vague, and
is more clear than the "version" language that was the subject
of the <u>NYSPRA</u> case. Not only must a firearm be exactly the same
or an imitation of a listed firearm under the current
legislation, it must be the functional equivalent. As such, the
provision does not leave a person without knowledge of what is
prohibited and the language at issue is not unconstitutionally
vague.

### C. **Assault Weapons**

The plaintiffs next argue that the legislation "lists
'assault weapons' by reference to 183 diferent names," but in
many cases the listed names "do not correspond to the names that
are actually engraved on the specific firearms," which leaves a

---

[74] New York Penal Law § 265.00(22)(c)(viii).

person "without knowledge of what is prohibited." Specifically, the plaintiffs argue that "[w]hile the validity of all the listed names cannot be litigated in this case, the court should declare that, consistent with due process, the Act's prohibitions may not be applied to firearms that are not engraved with precise names listed in the Act."

The defendants respond that "an individual does not need to know whether a firearm is included by name in the enumerated firearms provisions to determine whether it is banned. With the exception of the Remington 7615, all of the specifically enumerated weapons have the requisite action-type and military features that qualify them as an assault weapon under the applicable features test." The defendants also respond that "even if the existence of the generic features test were not dispositive – which it is – Plaintiffs' claim lacks merit because most guns have identifying information engraved directly on the gun."[75]

The legislation defines an assault weapon as "any of the following specified semiautomatic firearms: Algimec Agmi; Armalite AR-180;. . . the following specified semiautomatic

---

[75] Specifically, the defendants argue that "most individuals will be able to determine whether their firearm is prohibited simply by locating the make and model engravings that most firearms have;" and if no such engravings exist, by the firearms serial number, calling the manufacturer, calling a federally licensed firearms dealer, or calling the Special Licensing and Firearms Unit at the Department of Emergency Services and Public Protection.

centerfire rifles . . .: (i) AK-47; (ii) AK-74;. . . the following specified semiautomatic pistols . . .:(i) Centurion 39 AK; (ii) Draco AK-47; . . . the following semiautomatic shotguns . . .: All IZHMASH Saiga 12 Shotguns . . . ."[76]

The legislation's "generic features test"[77] provides notice as to what weapons qualify as an assault weapon, with the exception of the Remington 7615. The specific list of firearms, which includes the Remington 7615, essentially provides further clarification to owners of such weapons, if there were any doubt as to whether their weapon passed the generic features test. Thus, the court concludes that, when read together with the listed banned features of Conn. Gen. Stat. §§ 202a(1)(E)(i)(I)- (V),(iv)(I)-(IV) and (vi)(I)-(II), the provision does not leave a person without knowledge of what is prohibited and the provision is not unconstitutionally vague.

**D. <u>Modification, Alteration, or Assembly</u>**

The plaintiffs argue "[t]he Act's definition of an 'assault weapon' as a collection of unassembled parts involves components that an ordinary person may not even recognize as firearm- related."[78] Specifically, the plaintiffs argue that "[o]ne must

---

[76] <u>See</u> Conn. Gen. Stat. § 53-202a(1)(A)-(D).

[77] For example, these provisions provide that a semiautomatic centerfire rifle with a thumbhole stock (the generic feature) qualifies as an assault weapon. <u>See</u> Conn. Gen. Stat. §§ 202a(1)(E)(i)(I)-(V),(iv)(I)-(IV),(vi)(I)-(II).

[78] The plaintiffs state that several provisions in the act refer to the potential to "restore," "convert," "assemble" or "alter" magazines or parts

be intimately familiar with 183 listed firearms, must be able to identify all of the parts thereof, and must know that combinations of some parts may be 'rapidly assembled' into 67 firearms under three other categories."

The defendants respond that these claims lack merit because "the Second Circuit and numerous district courts have made clear that the applicable standard for assessing facial vagueness is actually the reverse of what Plaintiffs propose; a law survives a facial vagueness challenge if there are any conceivable applications of it." Specifically, the defendants argue that "[t]he term 'rapidly' is commonly understood to mean 'happening in a short amount of time' or 'happening quickly.'" The defendants state that "[t]he challenged language exists to prevent an individual from circumventing the ban by disassembling their weapon, only to rapidly reassemble it back into an assault weapon when they wish to use it."

Relevant provisions of the legislation provide that an "[a]ssault weapon means: . . . A part or combination of parts designed or intended to convert a firearm into an assault weapon, as defined in subparagraph (A)(i) of this subdivision, or any combination of parts from which an assault weapon, as defined in subparagraph (A)(i) of this subdivision, may be rapidly assembled if those parts are in the possession or under

in any given way. The plaintiffs also state other provisions place the adverbs "readily" and "rapidly" to modify these verbs.

43

the control of the same person;. . . "Large capacity magazine" means any firearm magazine, belt, drum, feed strip or similar device that has the capacity of, or can be <u>readily restored or converted</u> to accept, more than ten rounds of ammunition, but does not include (A) A feeding device that has been permanently altered so that it cannot accommodate more than ten rounds of ammunition . . . ."[79]

The Connecticut legislature did not have to specify the exact amount of time in which a weapon could be "rapidly assembled."[80] Such precision is not always possible due to the confines of the English language. "The Constitution does not require impossible standards." <u>United States v. Petrillo</u>, 332 U.S. 1, 7 (1947).[81]

Assault weapons and LCMs, broken into parts, which can be restored to their entirety without much effort, are "clear[ly] what the ordinance as a whole prohibits." <u>Grayned v. City of</u>

---

[79] <u>See</u> Conn. Gen. Stat. §§ 202a(1)(A)(ii); Conn. P.A. No. 13-220(a)(1).

[80] <u>See</u> <u>e.g.</u>, <u>Coal. of New Jersey Sportsmen, Inc. v. Whitman</u>, 44 F. Supp.2d 666, 681 (D.N.J. 1999) <u>aff'd</u>, 263 F.3d 157 (3d Cir. 2001) (concluding that "[s]urely the Legislature, intent on reaching assault weapons which could be altered in minor ways or disassembled to avoid the purview of the other assault weapon definitions, did not have to specify in hours and minutes and with reference to specific tools and degrees of knowledge the parameters of what 'readily assembled' means").

[81] <u>See</u> <u>also</u> <u>U.S. v. Catanzaro</u>, 368 F. Supp. 450, 454 (D. Conn. 1973) (finding that the phrase "which may be readily restored to fire" was not unconstitutionally vague *in se* and that it did not fail to provide fair warning to a person of ordinary intelligence that the item which is the subject matter of this indictment was a "firearm" within the terms of the National Firearms Act).

Rockford, 408 U.S. 104, 110 (1972). The court concludes that this challenged provision provides fair warning to a person of ordinary intelligence as to the prohibited conduct and, therefore, it is not unconstitutionally vague.

## E. Capacity to Accept More than Ten Rounds

The plaintiffs finally argue that many rifles and shotguns have tubular magazines in which cartridges are inserted one behind the other.[82] Specifically, the plaintiffs argue that the capacity of firearms "to accept cartridges in tubular magazines varies with the length of the rounds inserted therein." That is, the plaintiffs argue that the act is vague as to whether a magazine that accepts ten or less standard cartridges but more than ten smaller, non-standard rounds is unlawful.

The defendants respond that "[a]lthough it is true that the maximum capacity of tubular magazines can vary, Plaintiffs claim nevertheless lacks merit." Specifically, the defendants argue that "[a]n individual therefore need only locate and read the firearm's specifications to determine if the firearm can accept more than ten of any of its standard rounds . . . . If the magazine can accept more than ten of any standard round, it is clearly prohibited." The defendants further argue that very few

---

[82] The plaintiffs state that, for the same reasons, § 530-202a(1)(E)(ii), providing that "the definition of 'assault weapon' includes: 'A semiautomatic, centerfire rifle that has a fixed magazine with the ability to accept more than ten rounds . . .'" is also unconstitutionally vague.

tubular magazines would be "impacted by the ambiguity that Plaintiffs posit," and "[b]ecause the ten round limit will be clear and unambiguous in virtually all of its applications, therefore, it is not facially vague."

The legislation explicitly states that "[l]arge capacity magazine' means any firearm magazine, belt, drum, feed strip or similar device that has the capacity of, or can be readily restored or converted to accept, more than ten rounds of ammunition, but does not include: (A) A feeding device that has been permanently altered so that it cannot accommodate more than ten rounds of ammunition, (B) a .22 caliber tube ammunition feeding device, (C) a tubular magazine that is contained in a lever-action firearm, or (D) a magazine that is permanently inoperable . . . ."[83] The legislation states that an "[a]ssault weapon means: . . . (E) Any semiautomatic firearm regardless of whether such firearm is listed in subparagraphs (A) to (D), inclusive, of this subdivision, and regardless of the date such firearm was produced, that meets the following criteria: . . . (ii) A semiautomatic, centerfire rifle that has a fixed magazine with the ability to accept more than ten rounds . . . ."[84]

---

[83] Conn. P.A. 13-220, § 1(a)(1).

[84] See Conn. Gen. Stat. §§ 202a(1)(A)(ii).

Here, the court concludes that this provision of the legislation, if applied to standard cartridges, is not impermissibly vague in all its applications and, as such, it is not unconstitutionally vague.[85]

### IV.   CONCLUSION

For the foregoing reasons, the plaintiffs' motion for summary judgment (document no. 60) is DENIED; the defendants' cross motion for summary judgment (document no. 78) is GRANTED; and the plaintiffs' motion for preliminary injunction (document no. 14) is DENIED as moot.

It is so ordered this 30th day of January, 2014, at Hartford, Connecticut.


                                /s/
                        _____
                        Alfred V. Covello,
                        United States District Judge

---

[85] See e.g., Coal. of New Jersey Sportsmen, Inc. v. Whitman, 44 F. Supp.2d 666, 680 (D.N.J. 1999) aff'd, 263 F.3d 157 (3d Cir. 2001) (finding "the possibility of shorter, non-standard shells, which may or may not be in existence. . . is irrelevant when the statute's prohibition clearly encompasses the standard shells intended for the magazine").