**United States District Court**
For the Northern District of California

1
2
3                    IN THE UNITED STATES DISTRICT COURT
4
5                    FOR THE NORTHERN DISTRICT OF CALIFORNIA
6
7
8  SAN FRANCISCO VETERAN POLICE
   OFFICERS ASSOCIATION, LARRY BARSETTI,
   RAINERIO GRANADOS, ARTHUR RITCHIE,
9  and RANDALL LOW,                                    No. C 13-05351 WHA
10          Plaintiffs,
11     v.
12 THE CITY AND COUNTY OF SAN FRANCISCO,
   THE MAYOR OF SAN FRANCISCO, EDWIN            **ORDER DENYING**
13 LEE in his official capacity, THE CHIEF OF THE   **PRELIMINARY**
   SAN FRANCISCO POLICE DEPARTMENT,            **INJUNCTION**
14 GREG SUHR, in his official capacity, and DOES
   1–10,
15          Defendants.
16 _____/
17                            **INTRODUCTION**
18        In this action challenging a San Francisco ordinance banning the possession of firearm
19 magazines with the capacity to accept more than ten rounds, plaintiffs move for a preliminary
20 injunction. For the reasons set forth below, the motion is **DENIED**.
21                              **STATEMENT**
22        For over a decade, California has restricted firearm magazines holding more than ten
23 bullets, particularly restricting their manufacture, importation and sale, but has not prohibited
24 ownership by individuals. Cal. Penal Code Section 32310. This state law was enacted in 1999
25 to supplement a then-existing federal law, enacted in 1994, that prohibited the possession or
26 transfer of magazines with the capacity to accept more than ten rounds. The federal law expired
27 by its own terms in 2004. While the California statute generally prohibits the *making* of new
28 magazines with the capacity to accept more than ten rounds and *transfer* of existing ones, it does
   not prohibit their *possession*. This action does not challenge the constitutionality of this state

United States District Court
For the Northern District of California

1  law.  The challenge lies instead against a new local ordinance banning possession of magazines

2  holding more than ten rounds.

3  The background is as follows.  On December 14, 2012, a shooter, armed with an

4  assault weapon and several magazines with the capacity to accept more than ten rounds, entered

5  Sandy Hook Elementary School in Newtown, Connecticut.  He massacred 27 people, including

6  twenty young children (Van Aken Decl., Exh. 10 at 3, 22–23).  Following this horrific tragedy,

7  several state and local governments enacted bans on magazines with the capacity to accept more

8  than ten rounds.  As of this date, four courts have ruled on the constitutionality of these bans and

9  all four courts have upheld them.  *See Heller v. District of Columbia (Heller II)*, 670 F.3d 1244,

10  1264 (D.C. Cir. 2011); *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 2013 U.S. Dist. LEXIS 182307,

11  at *55–56 (W.D.N.Y. Dec. 31, 2013) (Judge William Skretny); *Shew v. Malloy*, 2014 U.S. Dist.

12  LEXIS 11339, at *39–40 (D. Conn. Jan. 30, 2014) (Judge Alfred Covello); *Tardy v. O'Malley*,

13  No. CCB-13-2861, TRO Hr'g Tr., at 66–71 (D. Md. Oct. 1, 2013) (Judge Catherine Blake).

14  For its part, San Francisco enacted Section 619 of the San Francisco Police Code,

15  challenged herein under the Second Amendment.  With certain exceptions, the ordinance

16  prohibits any person, corporation, or other entity in San Francisco from possessing a magazine

17  with the capacity to accept more than ten rounds, whether assembled or disassembled.

18  A magazine with the capacity to accept more than ten rounds is defined as:

19      . . . any detachable ammunition feeding device with the capacity to
        accept [more than ten rounds], but shall not be construed to include
20      any of the following:

21          (1)  A feeding device that has been permanently
        altered so that it cannot accommodate [more than ten
22      rounds];

23          (2)  A .22 caliber tube ammunition feeding
        device, or

24

25          (3)  A tubular magazine that is contained in a
        lever-action firearm.

26  The ordinance, by its own terms, bans magazines with the capacity to accept more than ten

27  rounds because they "significantly increase[] the lethality of the automatic and semiautomatic

28  firearms using them."  In particular, the ordinance explicitly identifies recent high-profile

2

United States District Court

For the Northern District of California

1    massacres where the shooter used magazines with the capacity to accept more than ten rounds,

2    including the Sandy Hook massacre.

3          The ordinance also explicitly addresses concerns regarding self-defense:

4              [Magazines with the capacity to accept more than ten rounds] are
               not necessary for individuals to vindicate their right to self-
5              defense.  Only in extraordinarily rare circumstances would a
               person using a firearm in self-defense ever be required to use a
6              large capacity magazine to defend himself or herself effectively.
               This is particularly true in an urban center like San Francisco,
7              where law enforcement can and does respond quickly to threats
               and incidents.  Conversely, the dangers of [magazines with the
8              capacity to accept more than ten rounds] are heightened in dense
               urban areas like San Francisco.

9

10         Any person who, prior to the passage of the ordinance, legally possessed a magazine

11   with the capacity to accept more than ten rounds is now required to store it out of state or

12   relinquish it within ninety days of the ordinance's enactment, either through sale, transfer, or

13   surrender to the San Francisco Police Department.  The parties have stipulated to extend the

14   enforcement date to April 7, 2014 (Dkt. No. 11).  The ordinance is tailored to provide for certain

15   exemptions, including:

16             (1)  Any government officer, agent, or employee, member
               of the armed forces of the United States, or peace officer, to the
17             extent that such a person is otherwise authorized to possess a large
               capacity magazine in connection with his or her official duties;

18             (2)  A person licensed pursuant to Penal Code Sections
               26700 to 26915, inclusive;

19
               (3)  A gunsmith for the purposes of maintenance, repair, or
20             modification of the large capacity magazine;

21             (4)  Any entity that operates an armored vehicle business
               pursuant to the laws of the state, and an authorized employee of
22             such entity, while in the course and scope of his or her
               employment for purposes that pertain to the entity's armored
23             vehicle business;

24             (5)  Any person, corporation or other entity that
               manufactures the large capacity magazine for a person mentioned
25             in subsection (a) or for export pursuant to applicable federal
               regulations;

26
               (6)  Any person using the large capacity magazine solely as
27             a prop for a motion picture, television, or video production, or
               entertainment event;

28

3

**United States District Court**

For the Northern District of California

1

2

        (7)  Any holder of a special weapons permit issued pursuant to Penal Code [Sections] 33300, 32650, 32700, 31000, or 18900;

3

4

5

6

        (8)  Any person issued a permit pursuant to Penal Code [Section] 32315 by the California Department of Justice upon a showing of good cause for the possession, transportation, or sale of large capacity magazines between a person licensed pursuant to Penal Code Section 26700 to 26915 and an out-of-state client, when those activities are in accordance with the terms of that permit;

7

8

9

        (9)  Any federal, state, or local historical society, museum, or institutional collection which is open to the public, provided that the large capacity magazine is properly housed[,] secured from unauthorized handling, and unloaded;

10

11

12

        (10)  Any person who finds the large capacity magazine, if the person is not prohibited from possessing firearms or ammunition pursuant to federal or state law, and the person possesses the large capacity magazine no longer than it is necessary to deliver or transport the same to a law enforcement agency for that agency's disposition according to law;

13

14

        (11)  A forensic laboratory or any authorized agent or employee thereof in the course and scope of his or her authorized activities;

15

16

17

        (12)  Any person in the business of selling or transferring large capacity magazines in accordance with Penal Code [Section] 12020, who is in possession of a large capacity magazine solely for the purpose of doing so; or

18

19

        (13)  Any person lawfully in possession of a firearm that the person obtained prior to January 1, 2000 if no magazine that holds 10 or less rounds of ammunition is compatible with that firearm and the person possesses the large capacity magazine solely for use with that firearm.

20

21

Any person who violates the ordinance is guilty of a misdemeanor (Van Aken Decl., Exh. 1 at 2–6).

22

23

24

25

26

27

28

     Plaintiffs Larry Barsetti, Rainerio Granados, Randall Low, and Arthur Ritchie are all residents of San Francisco who own magazines with the capacity to accept more than ten rounds (Barsetti Decl. ¶¶ 2–3; Granados Decl. ¶¶ 2–3; Low Decl. ¶¶ 2–3; Ritchie Decl. ¶¶ 2–3).  If San Francisco's ordinance is not enjoined, each of these plaintiffs will be forced to store their magazines with the capacity to accept more than ten rounds out of state or relinquish them by April 7.  Plaintiff San Francisco Veteran Police Officers Association represents veteran San Francisco Police Department members and their interests, including their asserted right to

4

United States District Court

For the Northern District of California

1    possess magazines with the capacity to accept more than ten rounds. An unspecified number of

2    members, including plaintiff Barsetti, are residents who own magazines with the capacity

3    to accept more than ten rounds. These members will also be forced to store their magazines

4    with the capacity to accept more than ten rounds out of state or relinquish them by April 7 if

5    the City's ordinance is not enjoined. Other members are non-residents who will be prohibited

6    from carrying their magazines within San Francisco, as they currently do in accordance with

7    state law (Vannucci Decl. ¶¶ 1,4, 7, 9). All individual plaintiffs claim that they would continue

8    to possess magazines with the capacity to accept more than ten rounds but for Section 619 of

9    the San Francisco Police Code.

10         Plaintiffs now move for a preliminary injunction to suspend Section 619 of the

11    San Francisco Police Code. This order follows full briefing, oral argument, and supplemental

12    briefing after argument concerning a recent and subsequent decision by our court of appeals.

13                             **ANALYSIS**

14         To obtain a preliminary injunction, plaintiffs must establish: (1) they are likely to

15    succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary

16    relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest.

17    *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted).

18         As an alternative avenue to a preliminary injunction, our court of appeals has held

19    that "serious questions going to the merits and a hardship balance that tips sharply toward the

20    plaintiff can [also] support issuance of an injunction, assuming the other two elements of the

21    *Winter* test are also met." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132

22    (9th Cir. 2011). "Serious questions" refers to questions "which cannot be resolved one way or

23    the other at the hearing on the injunction and as to which the court perceives a need to preserve

24    the status quo lest one side prevent resolution of the questions or execution of any judgment by

25    altering the status quo." *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir. 1991).

26         **1.**      **THE MERITS.**

27         The Second Amendment states: "A well regulated Militia, being necessary to the

28    security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

United States District Court
For the Northern District of California

1  Plaintiffs argue that they are likely to succeed on the merits, or at least raise serious questions

2  going to the merits, because the ordinance is "categorically" unconstitutional or, at the very least,

3  fails heightened scrutiny.

4  In 2008, the Supreme Court held that the Amendment protected the fundamental

5  "individual right to keep and bear arms." *District of Columbia v. Heller*, 554 U.S. 570, 622

6  (2008). The "central component" of the right is individual self-defense. *Id*. at 599. This right

7  is incorporated against states and municipalities by way of the Fourteenth Amendment.

8  *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3050 (2010).

9  The Supreme Court, however, recognized several important limitations on the Second

10  Amendment's protection. While the Amendment is not restricted to militia service, the Supreme

11  Court emphasized that the "central component" of the Amendment protects an individual's right

12  to own firearms for self-defense, particularly defense of the home. *Heller*, 554 U.S. at 628–29.

13  The Supreme Court found that "the American people have considered the handgun to be

14  the quintessential self-defense weapon [in common use] . . . for self-defense in the home."

15  Thus, the District of Columbia's "complete prohibition of their use [was] invalid" because it

16  "[amounted] to a prohibition of an entire class of 'arms' that was overwhelmingly chosen by

17  American society for that lawful purpose" and therefore failed "any of the standards of scrutiny

18  that [the Supreme Court has] applied to enumerated constitutional rights." *Heller*, 554 U.S. at

19  628–29.

20  A very recent decision by our court of appeals extended *Heller* to protect the right to bear

21  arms for purposes of self-defense in public, *i.e.*, outside the home. *Peruta v. County of*

22  *San Diego*, No. 10-56971, at *47 (Feb. 13, 2014). *Peruta* held that the Second Amendment was

23  violated by a combination of laws that amounted to a *total* ban on carrying a firearm in public for

24  self-defense. *Id*. at *52–55. Significantly, the ordinance in question herein would not be such a

25  *total* ban. Possessing magazines that have the capacity to accept ten rounds or fewer would still

26  be perfectly legal under the challenged ordinance. *Peruta* repeatedly recognized the authority of

27  the government to impose at least some limits for public safety. *See, e.g.*, *id.* at 11, 15, 75–76.

28  Given that the San Francisco rule is not a total ban on self-defense at home or in public, there is

United States District Court

For the Northern District of California

1  no occasion whatsoever to apply the "categorical" prohibition advanced by plaintiffs, even if

2  such a "categorical" test had ever been adopted by our appellate courts (which has not occurred).

3       Nonetheless, the district judge is required to assess the extent to which the ordinance will

4  burden the Second Amendment, for the closer the burden comes to the core of the Second

5  Amendment, the stricter must be our scrutiny. *United States v. Chovan*, 735 F.3d 1127, 1138

6  (9th Cir. 2013); *Peruta*, slip op. at *50.

7       It is possible, of course, to use a magazine holding more than ten rounds for self-defense.

8  But, again, we are not dealing with a total ban on all magazines. Instead, we are dealing with a

9  total ban only on magazines holding more than ten rounds. Magazines holding up to ten rounds

10  are perfectly legal under the ordinance. The record shows that the average number of shots fired

11  in self-defense is 2.2 rounds (Allen Decl. ¶ 7). The record further shows that the number of

12  instances in which more than ten rounds have been fired in self-defense (in our entire country)

13  by civilians is exceedingly rare (Ayoob Decl. ¶¶ 4–17). Moreover, it would be perfectly lawful

14  under the San Francisco ordinance to carry or keep two magazines, each holding ten rounds, for

15  a total of twenty rounds — even more if more magazines are desired. If and when the first

16  magazine ran out, the self-defender could eject it and insert a backup. The scenario described by

17  counsel for plaintiffs in which an assailant keeps coming, though riddled with bullets, even

18  through the heart, so that more than ten shots are needed, even if fully credited, is nonetheless

19  answered by the ability of the self-defender to have two or more magazines. The same is true of

20  the scenario in which there are multiple assailants.

21       In sum, the San Francisco ordinance does not "destroy" the right to self-defense; it

22  "merely burdens" it. *Peruta*, slip op. at 48, 50, 52, 56, 60–61. In turn, the degree of scrutiny

23  required is less severe. This order will apply the so-called intermediate scrutiny, but will also

24  find below that even under any higher scrutiny, the San Francisco ordinance is constitutional.

25       This order pauses to note that while the *Peruta* majority (and dissent) extensively

26  examined the history of the American and English experience at the time of the ratification of

27  our Second Amendment, plaintiffs (and defendants) have completely ignored the pertinent

28  history in the briefing on this order. On appeal, counsel are requested to own up to this gap in

7

United States District Court

For the Northern District of California

1  their record.  The bottom line on history is that there is no proof that multi-bullet magazines for

2  firearms were in use at the time of the ratification of the Second Amendment.  Historians will

3  remember, in any event, that the Spencer and Henry repeating rifles came along during our Civil

4  War and would appear, at least to the undersigned judge, to have introduced the earliest

5  magazines for firearms.

6       Perhaps in light of this gap in the record, plaintiffs' counsel have fallen back on the

7  argument that magazines holding more than ten are commonplace and prevalent today.  The

8  record provided by counsel does not actually show that such magazines are common or prevalent

9  among law-abiding citizens (as opposed to criminals and law enforcement).  The record shows

10  only that a large number of such magazines have been made and sold, but does not break down

11  how they are possessed.  Nonetheless, passing that shortfall in the record, the main point is that

12  we are *not* concerned with a total ban on magazines and thus the burden on Second Amendment

13  interests is reduced.

14       Turning to intermediate scrutiny, this order finds that the San Francisco ordinance is

15  substantially related to its interests in promoting public safety and preventing gun violence.  Its

16  ordinance prevents mass murderers from firing a larger number of rounds faster by depriving

17  them of magazines with the capacity to accept more than ten rounds (Koper Decl. ¶ 7; Zimring

18  Decl. ¶¶ 16–19).  The record demonstrates that there is a very high correlation between mass

19  shootings and the use of magazines with the capacity to accept more than ten rounds (Koper

20  Decl. ¶ 14; Allen Decl. ¶ 17).  The ordinance specifically identifies several high-profile mass

21  shootings where magazines with the capacity to accept more than ten rounds were used:

22            (1)  The shooting on the campus of Virginia Tech on
          April 16, 2007, where 32 people were killed and many others
23         wounded,

24            (2)  The shooting in a gym in Pittsburgh on August 4, 2009,
          where three people were killed and nine others injured,
25

          (3)  The shooting on November 5, 2009, at Fort Hood,
26       Texas, where 13 people were killed and 34 more were wounded,

27            (4)  The shooting on January 8, 2011, at Tucson, Arizona,
          where six people were killed, including U.S. District Judge John
28       Roll, and 13 people were injured, including a then-member of the
          United States House of Representatives Gabrielle Giffords,

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> (5)  The shootings on December 14, 2012, at Newtown, Connecticut, where 27 people (not including the shooter) were killed (Van Aken Decl., Exh. 1 at 2).

San Francisco has proven that its ordinance is substantially related to its goals of protecting public safety and reducing injuries resulting from criminal use.  This is true on the motion record without giving any deference to San Francisco's legislative judgment.

Turning to the least restrictive means, the San Francisco ordinance has taken care to recognize exemptions designed to accommodate instances in which there may be an unusual need for magazines holding more than ten bullets, such as, for example, owners of firearms for which no magazine holding ten or fewer rounds is available, and law enforcement, to take only two of the thirteen exemptions set forth above.  But the thrust of the prohibition on possession is to remove these especially lethal items from circulation so that they will be unavailable, or at least less available, to mass murderers.  Had the line been drawn at say twelve or fifteen, the incremental benefit to self-defense would have been minuscule, but the incremental risk to school children and other victims would have been proportionately worse and palpable.  Therefore, a least restrictive means test, if it applies, has been met by San Francisco.

Notwithstanding the earlier holding by our court of appeals in *Chovan*, this order recognizes that the majority opinion in *Peruta* includes passages that cast doubt on the continuing use of intermediate scrutiny in Second Amendment cases (*see Peruta*, slip op. at *63–73, particularly page 73).  Please bear in mind, however, that even *Peruta* reserved its stricter test for *total* bans on the right of self-defense and recognized that "mere burdens" were permitted under the Second Amendment.  This order need not choose because, even under the stricter test in *Peruta*, the San Francisco ordinance passes muster.

Finally, please remember that, as *Peruta* states, "[t]he right is, and always has been, oriented to the end of self-defense."  Therefore, the fact that a clip with more than ten rounds may be handy in target practice or competitions fails to cut a figure under the Second Amendment.  Self-defense is what matters.

9

United States District Court
For the Northern District of California

1

### 2.   EXTENT OF IRREPARABLE HARM.

2      Plaintiffs argue that they will suffer irreparable harm absent a preliminary injunction

3   because they will have to surrender their magazines with the capacity to accept more than

4   ten rounds by April 7 in order to comply with the San Francisco ordinance.  Should they prevail

5   on the merits after that date, they will be unable, they say, to acquire new ones because of

6   California's prohibition on the sale or transfer of new magazines with the capacity to accept

7   more than ten rounds.

8      In the event that plaintiffs prevail on the merits, however, the City and County of

9   San Francisco is ordered to return plaintiffs' surrendered magazines back to them.  Moreover,

10   plaintiffs can always store their magazines with the capacity to accept more than ten rounds out

11   of state.  This greatly minimizes the likelihood of irreparable injury.  In the meantime, they can

12   use magazines accepting ten rounds or fewer to defend themselves.

13      Because plaintiffs have not shown a constitutional violation or a likelihood thereof,

14   there is no occasion to consider their argument that irreparable injury must automatically be

15   presumed to flow from the violation.

16      ### 3.   BALANCE OF EQUITIES.

17      In ruling on a preliminary injunction, courts "must balance the competing claims of

18   injury and must consider the effect on each party of the granting or withholding of the requested

19   relief." *Winter*, 555 U.S. at 24 (citations omitted).  Here, the balance of the equities lies in favor

20   of San Francisco.  If a preliminary injunction is denied, then plaintiffs will have to resort to

21   using magazines that can accept ten rounds or fewer.  Moreover, San Francisco will return

22   plaintiffs' surrendered magazines back to them if the ordinance is ultimately found

23   unconstitutional.  These considerations are vastly outweighed by the demonstrated need to

24   remove magazines from circulation that are capable of accepting more than ten rounds.  Such

25   magazines allow mass killers to shoot more victims before reloading, multiplying the number of

26   deaths (Zimring Decl. ¶¶ 16–19).  If a mass murderer has to reload because he or she does not

27   have a magazine with the capacity to accept more than ten rounds, there is a better chance that

28   someone present will subdue him or her sooner (Van Aken Decl., Exhs. 18, 22–23).

United States District Court

For the Northern District of California

1    Although there will be some occasions when a law-abiding citizen needs more than

2   ten rounds to defend himself or his family, the record shows that such occasions are rare.  This

3   will be even rarer in a dense urban area like San Francisco where police will likely be alerted at

4   the outset of gunfire and come to the aid of the victim.  Nonetheless, in those rare cases, to

5   deprive the citizen of more than ten shots may lead to his or her own death.  Let this point be

6   conceded.  In assessing the balance of equities, those rare occasions must be weighed against

7   the more frequent and documented occasions when a mass murderer with a gun holding eleven

8   or more rounds empties the magazine and slaughters innocents.  *One critical difference is that*

9   *whereas the civilian defender rarely will exhaust the up-to-ten magazine, the mass murderer*

10  *has every intention of firing every round possible and will exhaust the largest magazine*

11  *available to him.*  On balance, more innocent lives will be saved by limiting the capacity of

12  magazines than by allowing the previous regime of no limitation to continue.

13      **4.      PUBLIC INTEREST.**

14      For the same reason, the public interest favors immediate enforcement of the

15  San Francisco ordinance.  Within the last thirty years, 86 percent of mass shootings involved

16  at least one magazine with the capacity to accept more than ten rounds (Koper Decl. ¶ 15;

17  Allen Decl. ¶ 17).  More people are injured or killed per mass shooting with a magazine with

18  the capacity to accept more than ten rounds than without (Allen Decl. ¶ 14; Koper Decl. ¶ 20).

19  San Francisco's interest in preventing another Sandy Hook tragedy constitutes a "critical public

20  interest."

21      Moreover, San Francisco's ordinance explicitly cites the danger that police officers face

22  when targeted with magazines with the capacity to accept more than ten rounds as one of its

23  justifications for the ban (Van Aken Decl., Exh. 1 at 3).  San Francisco's interest in protecting

24  the lives and safety of its police officers is also central to the public interest (Lazar Decl. ¶¶

25  8–9, Exh. A).  Thus, it has compellingly established two critical reasons why immediate

26  enforcement is in the public interest.

27

28

United States District Court
For the Northern District of California

**5.** **THE ALTERNATIVE TEST.**

Regardless of whether or not plaintiffs have raised "serious questions" about the constitutionality of San Francisco's ordinance, plaintiffs have failed to show that the balance of equities tips in their favor, much less "sharply" so.  In this regard, please note that "serious questions" do not translate to a violation severe enough to trigger a presumption of irreparable harm.

*              *              *

In addition to their reply brief, plaintiffs raise 28 evidentiary objections in a separate sixteen-page filing.  Local Rule 7–3(c), however, requires that plaintiffs file their evidentiary objections "within the reply brief or memorandum."  Moreover, a motion for preliminary injunction must be supported by evidence that goes beyond the unverified allegations of the pleadings, but "the district court may rely on otherwise inadmissible evidence, including hearsay evidence."  *Fid. Nat'l Title Ins. Co. v. Castle*, 2011 U.S. Dist. LEXIS 135316, at *10–12 (N.D. Cal. Nov. 23, 2011) (Judge Susan Illston); *Gonzalez v. Zika*, 2012 U.S. Dist. LEXIS 138613, at *3 (N.D. Cal. Sep. 26, 2012) (Judge Claudia Wilken); *Murphy v. Bank of N.Y. Mellon*, 2013 U.S. Dist. LEXIS 97854, at *10 (N.D. Cal. July 12, 2013) (Judge Jon Tigar).  Thus, plaintiffs' requests to strike various declarations submitted by defendants are **DENIED**.

## CONCLUSION

For the reasons stated above, plaintiffs' motion for preliminary injunction is **DENIED**.

**IT IS SO ORDERED.**

Dated:  February 19, 2014.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE